Randi A. Kassan
Vicki J. Maniatis
Melissa K. Sims
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Tel. (516) 741-5600
Fax: (516) 741-0128
rkassan@milberg.com
vmaniatis@milberg.com
msims@milberg.com

*Attorneys for Plaintiffs* **Pike County School Corporation**
and **Metropolitan School District of Wabash County**


# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT COURT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Pike County School Corporation and Metropolitan School District of Wabash County, individually and on behalf of others similarly situated, | No. |
| | MDL No. 3:19-md-02913-WHO |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| JUUL Labs, Inc. f/k/a PAX Labs, Inc.; Altria Group, Inc.; Altria Client Services LLC; Altria Group Distribution Company; Nu Mark LLC; Nu Mark Innovations, LTD.; Philip Morris USA, Inc.; and ABC CORPORATIONS 1-100, | |
| Defendants. | |

# Table of Contents

I.     JURISDICTION AND VENUE .................................................................. 4

II.    PARTIES ................................................................................................... 5

    1.    Plaintiffs .......................................................................................... 5

    2.    Defendants ...................................................................................... 5

III.   ALLEGATIONS OF FACT ...................................................................... 8

    1.    Scheme to Reap Profits Lost from Telling the Truth: Big Tobacco Target Children Again ................................................................. 8

    2.    Nicotine's Effect on Children: Creating the Addiction Cycle for Lifelong Customers ........................................................................ 13

    3.    Tobacco giants marketed an e-cigarette with high nicotine content and sweet flavors ........................................................................ 16

    4.    16

    5.    JUUL's Wildly Successful Youth Marketing ............................... 18

    6.    Big Tobacco and E-Cigarettes ..................................................... 23

    7.    JUUL and Altria Join Forces to Protect JUUL's Market Share .............................. 3

    8.    The Secret to JUUL's Success: Hooking Kids ............................ 40

    9.    Youth Addiction: The Cost of JUUL's Success .......................... 53

    10.   JUUL's "Remedial" Measures ..................................................... 60

    11.   JUUL and Schools ......................................................................... 6

    12.   The Impact on Plaintiffs' School Districts ................................... 67

IV.   CLASS ACTION ALLEGATIONS ......................................................... 73

    1.    Class Definition ............................................................................ 73

    206.  Pursuant to provisions of the Federal Rules of Civil Procedure ("Rule") 23(a), (b)(2), and (b)(3), Plaintiff brings this action on its own behalf and on behalf of a proposed Indiana statewide class of other similarly situated school districts (collectively, "the Indiana Class"), defined as follows: ................ 73

V.    CAUSES OF ACTION ............................................................................ 77

COUNT I: Public Nuisance ............................................................................. 77

COUNT II: Civil Conspiracy .......................................................................... 83

1.     The Conspirators Sought to Fraudulently Increase Defendants' Profits and Revenues ...................................................................................................84

2.     Deliberate actions..................................................................................87

3.     Plaintiffs Have Been Damaged by Defendants' Actions .......................................91

COUNT III: Consumer Fraud and Deceptive Consumer Sales ....................................92

COUNT IV: Deceptive TRADE Practices Violation, Indiana Code 24-5-0.5 *et seq.* and 35-43-5-3 *et seq.* ..........................................................................................95

COUNT V: Breach of Implied Warranties ........................................................97

COUNT VI: Negligence ...............................................................................98

COUNT VII: Common Law Fraud ...................................................................100

COUNT VIII: Unjust Enrichment/Restitution .....................................................102

## **INTRODUCTION**

1.     Plaintiffs, Pike County School Corporation and Metropolitan School District of Wabash County bring this class action individually and on behalf of all similarly situated school districts in the State of Indiana (the "Class") which have been injuriously affected by Big Tobacco Defendants JUUL Labs, Inc., Altria Group, Inc., Altria Client Services, Inc., Altria Group Distribution Company, Nu Mark LLC, Nu Mark Innovations, LTD., Philip Morris USA, Inc., and ABC CORPORATIONS 1-100 and their conduct in marketing and distribution of e-cigarettes to minors.

2.     Plaintiffs bring this action for injunctive relief, abatement, and damages arising out of the injuries to their property, students, and employees caused by Defendants' wrongful conduct.

3.     Plaintiffs reasonably fear that, as described below, Defendants' marketing strategy, advertising, product design targets minors, especially teenagers, and, along with unlawful sales, will increase the likelihood that minors, like the students in Pike County School Corporation and

Metropolitan School District of Wabash County will begin using e-cigarettes and become addicted to Defendants' e-cigarette products and this will cause further harm to Plaintiffs and other similarly situated.

## I.    JURISDICTION AND VENUE

4.    This case is being filed directly in this court pursuant to Case Management Order No. 3 – *In Re: Juul Labs Inc., Mktg., Sales Practices and Prods. Liab. Litig.*, Case No. 19-md-02913. In absence of direct filing, Plaintiffs would have filed in the United States District Court for the Northern District of Indiana.

5.    On remand, the Norther District of Indiana has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one plaintiff and defendant are citizens of different states. The Northern District of Indiana has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.    On remand, the Northern District of Indiana has personal jurisdiction over Defendants because they carry on a continuous and systematic part of their general business within Indiana, including the Northern District of Indiana, and have transacted substantial business with Indiana entities and residents, and have caused harm in Indiana as a result of the specific business activities complained of herein, either directly or through their agents.

7.    Venue is proper in the Northern District of Indiana on remand pursuant to 28 U.S.C.§1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District, and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

### 1.    Plaintiffs

8.    Pike County  School Corpoation is a public-school district, in Petersburg, Indiana, Pike County, Indiana, with approximately 1950 students enrolled in 2021 ranging from kindergarten to twelfth grade.

9.    Metrtopolitan School District of Wabash County, is a public-school district located in the city of Wabash, Wabash County, Indiana, with approximately 2159 students enrolled in 2021 ranging from kindergarten to twelfth grade.

### 2.    Defendants

10.    Defendant **JUUL** is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes, JUUL pods and accessories. Defendant JUUL Labs, Inc. ("JUUL"), formerly known as PAX Labs, Inc., formerly known as Ploom, Inc., was incorporated in Delaware on March 12, 2007 under the name Ploom, Inc. and has its principal place of business in San Francisco, California. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes, JUULpods and accessories.

11.    In 2015, Ploom, Inc. changed its name to PAX Labs, Inc.

12.    In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, Defendant PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

13.    Prior to the formation of PAX in April 2017, JUUL manufactured, designed, sold,

marketed, promoted, and distributed JUUL e-cigarettes, JUULpods, and accessories under the name PAX Labs, Inc. In 2016, JUUL also launched the PAX Era, a device that looks almost identical to the JUUL but is primarily marketed for vaping THC liquid.

14.    On information and belief, JUUL formed PAX for the purpose of spinning PAX (and the marijuana vaping business) off to JUUL's shareholders. When it formed PAX and in anticipation of the imminent spinoff, JUUL transferred, for no consideration, assets with substantial value to PAX, including (i) patents and other assets those related to the manufacture and sale of the PAX Era and other marijuana vapor products, (ii) on information and belief, assets and property gained through JUUL's history of developing and designing vapor products that would appeal to youth and marketing and selling vapor products to youth, and (iii) the PAX Labs, Inc. brand, which was developed through JUUL's pre-April 2017 business activities. PAX also benefited from the experience of JUUL's founders, Adam Bowen and James Monsees, both of whom act as directors and promoters of PAX.

15.    PAX has also obscured any public distinction between it and JUUL; for example, until at least October 24, 2019, PAX's website said it was founded in 2007.

16.    In June 2017, JUUL completed the spinoff of PAX by transferring the shares of PAX to the shareholders of JUUL. JUUL received no consideration in this transaction.

17.    Defendant **Altria Group, Inc**. is an American corporation and one of the world's largest producers and marketers of tobacco, cigarettes and related products. It operates worldwide and is headquartered in unincorporated Henrico County, Virginia, Altria is the parent company of  defendant Philip Morris USA and is the producer of Marlboro cigarettes, John Middleton, Inc., U.S. Smokeless Tobacco Company, Inc., Philip Morris Capital Corporation, and Chateau Ste. Michelle Wine Estates. Philip Morris USA is considered one of the largest tobacco

corporations in the world and is often referred to as a member of "Big Tobacco." Altria also maintains large minority stakes in Belgium-based brewer ABInBev, the Canadian cannabis company Cronos Group, and the e-cigarette maker JUUL Labs.. Altria is one of the world's largest producers and marketers of tobacco products. On December 20, 2018, Altria purchased a 35% stake in JUUL.

18.     Defendant **Altria Client Services Inc**. is a New York corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Client Services Inc. provides Altria Group, Inc. and its companies with services in many areas including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. On September 25, 2019, the former senior vice president and chief growth officer of Altria Client Services Inc., K.C. Crosthwaite, became the new chief executive of JUUL.

19.     Defendant **Altria Group Distribution Company** is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc. with its principal place of business in Henrico County, Virginia. Altria Group Distribution Company provides sales, distribution and consumer engagement services to Altria's tobacco companies.

20.     Defendant **Nu Mark LLC** is a Virginia corporation and wholly owned subsidiary of Altria Group, Inc., with its principal place of business in Richmond, Virginia. Nu Mark LLC was engaged in the manufacture and sale of Altria's electronic vapor products. Shortly before Altria purchased a 35% stake in JUUL in December 2018, Altria Group, Inc. announced that Nu Mark would be discontinuing the production and sale of all e-vapor products.

21.     Defendant **Nu Mark Innovations, Ltd.** is a subsidiary of Nu Mark LLC located in Beit Shemesh, Israel. Nu Mark Innovations, Ltd. provides digital marketing and customer care

services for Nu Mark LLC and Altria's e-vapor brands, as well as product and technology development services.

22.     Defendant Philip Morris USA, Inc. ("Philip Morris), is a wholly-owned subsidiary of Altria.  Phil8ip Morris is a Virgina corporation with a principal place of business in Richmond, Virginia.   Philip Morris is the largest manufacturer and seller of cigarettes in the United States.

23.     **ABC Corporations 1-100** aided, abetted and participated in the unlawful marketing and sale of electronic cigarettes to minors in Indiana, the identify of which are unknown to Plaintiffs at this time.

## III.   ALLEGATIONS OF FACT

## 1.     Scheme to Reap Profits Lost from Telling the Truth: Big Tobacco Target Children Again

24.     The Manufacturer Defendants' marketing campaigns hooked teens who had never tried traditional cigarettes on their e-cigarette products.

25.     Since 2000, cigarette smoking among Indiana high school seniors has decreased from 31.6% to 5.2% in 2018.[1]

26.     E-cigarette use by high school seniors is higher than cigarette use was 10 years ago. Between 2016 to 2018, e-cigarette use in Indiana youth nearly doubled.   And since 2012, e-cigarette use among middle school and high school students increased nearly 5-fold.  E-cigarettes remained the most commonly used tobacco product among Indiana middle school (5.5%) and high school (18.5%) sstudents in 2018, with even higher rates for four JUUL at 6% and 24.2%

---

[1] https://www.in.gov/health/tpc/files/2018-Indiana-YTS-Report_08_2019.pdf

in 2018. Id.

27.    E-cigarettes put youth at risk for addiction and possibly worse asthma outcomes[2], yet almost 40% of 10th and 12th grade youth believe there is low or no risk of negative health effects.[3]

28. Primarily as a result of litigation and strict regulation, cigarette smoking among

Indiana high school seniors plummeted from 31.6 % in 2008 to just 5.2% in 2018.

29.    For years, tobacco companies fought litigation and strict regulation, claiming that tobacco was not a public health crisis.

30.    Eighteen years after the United States Department of Justice filed a deliberate lawsuit[4] against tobacco companies, including the Defendants, PM Altria (then Phillip Morris) and RJ Reynolds, tobacco companies were finally forced to run ads on television in 2017 and tell the truth about their products, including:

- "Smoking kills, on average, 1,200 Americans every day."

- "There is no safe level of exposure to second-hand smoke."

- "All cigarettes cause cancer, lung disease, heart attacks and premature death — lights, low tar, ultra-lights and naturals. There is no safe cigarette."

- "Cigarette companies control the impact and delivery of nicotine in many ways. Including designing filters and selecting cigarette paper to maximize the ingestion of nicotine. Adding ammonia to make the cigarette taste less harsh and controlling the

[2] U.S. Food & Drug Administration. 2018. Youth E-cigarette Prevention Campaign Press Release. Retrieved from https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm

[3] Center for Prevention Research and Development

[4] *United States of America v. Philip Morris USA, Inc. et al*, 99-4426, District of Columbia

9

physical and chemical makeup of the tobacco blend."[5]

31.     In her 1682 page amended opinion, U.S. District Judge Gladys Kessler ruled in 2006 that tobacco companies would have to pay for and place these truthful ads, but the companies kept appealing her decision, and delaying the truth about their products.

32.     Judge Kessler's scathing ruling made no bones about what the tobacco companies did to get children addicted to their deadly products:

> "Defendants have known many of these facts for at least 50 years or more. Despite that knowledge, they have consistently, repeatedly, and with enormous skill and sophistication, denied these facts to the public, to the Government, and to the public health community. Moreover, in order to sustain the economic viability of their companies, Defendants have denied that they marketed and advertised their products to children under the age of eighteen and to young people between the ages of eighteen and twenty-one in order to ensure an adequate supply of replacement smokers," as older ones fall by the wayside through death, illness, or cessation of smoking.  In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." page 3-4.

33.     While exhausting their appeals of this decision, the Defendants embarked upon a nationwide campaign to target children once again, this time with deadly products which look like school supplies.

34. The e-cigarette devices come in a variety of shapes and sizes, some similar to look

---

[5] Fox, Maggie *"Big Tobacco finally tells the truth in court-ordered ad campaign"* NBC News, November 26, 2017

like regular cigarettes, but many are camouflaged to resemble ubiquitous school supplies, such as pens or USB flash drives.

35.    E-cigarettes are devices which produce an aerosol by heating a liquid that usually contains nicotine flavorings, and other chemicals that help to make the aerosol. Bystanders can also breathe in this aerosol when the user exhales into the air.

36.    The nicotine in e-cigarettes is highly addictive.

37.    This incredible progress towards eliminating youth tobacco use has now largely been reversed due to e-cigarettes and vaping. Between 2011 and 2015, e-cigarette use among high school and middle school students increased 900%.[6]

38.    According to the CDC, e-cigarette use among middle and high school students tripled between 2013 and 2014.

39.    Not coincidentally, this sharp increase occurred as Big Tobacco, facing declining sales of traditional cigarettes, entered the e-cigarette market and poured millions of dollars into youth-oriented marketing.

40.    A 2014 congressional investigation found that e-cigarette companies were targeting young people by giving away free samples at music and sporting events and running radio and television advertisements during youth-oriented programs—activities that are prohibited in the marketing of traditional cigarettes. But as Defendants Lorillard, LLC ("Lorillard"), Reynolds American Inc. ("Reynolds American"), Imperial Brands p.l.c. ("Imperial Brands"), and Altria Group, Inc. and its subsidiaries Altria Client Services Inc., Altria Group Distribution Company, and Nu Mark, LLC, and Nu Mark Innovations, Ltd (collectively, "Altria" or "Altria

---

[6] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth,* Ctrs. for Disease Control & Prevention (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-ecigarette-use-among-youth-2018.pdf.

11

Defendants") knew from decades of experience and market research, these strategies are what works to create a new generation of addicted customers.

41.     Between 2017 and 2018, e-cigarette use increased 78% among high school students, from 11.7% of high school students in 2017 to 20.8% of high schoolers in 2018.[7] Among middle school students, e-cigarette use increased 48% between 2017 and 2018.[8] In 2018, 4.9 million middle and high school students used tobacco products, with 3.6 million of those students using e-cigarettes.[9] Between 2017 and 2018, the number of youth e-cigarette users increased by 1.5 million.[10]

42.     According to the Centers for Disease Control and Prevention ("CDC") Director Robert Redfield, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[11]

43.     The U.S. Food and Drug Administration ("FDA") Commissioner Scott Gottlieb described the above statistics as "astonishing" and both the FDA and the U.S. Surgeon General

_____

[7] *Id.*

[8] 2018 NYTS Data: *A startling rise in youth e-cigarette use,* U.S. Food & Drug Admin. (Feb.2, 2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use.

[9] *Id.*

[10] *Id.*

[11] *Texas governor signs law increasing the age to buy tobacco products to 21,* CNN (June 8, 2019), https://m.cnn.com/en/article/h_b4cf0b92fd821251a4ae48df9b717145.

have appropriately characterized youth vaping as an "epidemic."[12] The National Institute on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance recorded in 44 years, and Alex Azar, Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[13]

**2.    Nicotine's Effect on Children: Creating the Addiction Cycle for Lifelong Customers**

44.    Nicotine is highly-addictive and acts directly on the neurotransmitter dopamine, causing a dependence similar to heroin and other deadly opiates. Nicotine's potency is even more pronounced when used by adolescents, affecting brain development, attention, cognition, and raising the risk of addiction to other drugs. The addictive nature of nicotine is widely known. A 2007 study found that nicotine was the third most addictive substance in the world behind heroin and cocaine.

45.    Nicotine's highly addictive nature stems from its effects on the central nervous system. When ingested, nicotine can accelerate blood pressure and pulse, affect mood, increase

---

[12] Angelica LaVito, *FDA chief Gottlieb threatens to pull e-cigarettes off market if 'astonishing' surge in teen use doesn't slow*, CNBC (Nov. 16, 2018), https://www.cnbc.com/2018/11/16/fda-chief-gottlieb-threatens-to-pull-ecigarettes-off-market.html Jayne O'Donnell, *FDA declares youth vaping an epidemic, announces investigation, new enforcement*, USA Today (Sept. 12, 2018), https://www.usatoday.com/story/news/politics/2018/09/12/fdascott-gottlieb-youth-vaping-e-cigarettes-epidemic-enforcement/1266923002/.

[13] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

circulating levels of hormones and neurotransmitters, increase metabolic rate, constrict blood vessels, and cause muscle relaxation. Once nicotine enters the body through inhalation, it is distributed quickly through the bloodstream and crosses the blood-brain barrier, reaching the brain within 10-20 seconds after inhalation. The acute effects of nicotine, though, are fleeting and dissipate in a few minutes. This causes the user to continue dosing frequently throughout the day to maintain the drug's pleasurable effects and prevent withdrawal.

46.     Nicotine has the potential to adversely affect the heart (ischemia and myocardial dysfunction), eyes (macular degeneration and cataracts), reproductive system (irregular menstrual cycles), lungs (asthma and emphysema), kidneys (chronic kidney disease), and has teratogenic side-effects (cognitive deficits and behavioural abnormalities). Exposure to nicotine, even from non-traditional tobacco sources such as nicotine e-cigarettes, produces an increased risk of cardiovascular disease, an increased risk of peripheral arterial disorders due to the increase in blood pressure and its constrictive effect on blood vessels, and an increased risk of stroke.

47.     The adolescent brain is exceptionally more vulnerable to the addictive effects of nicotine because the circuits of the brain underlying pleasure and the pursuit of novel and enjoyable experiences develop faster than the circuits in the brain that promote decision-making, impulse control, and rational thinking. Compared with adults, adolescents are generally more motivated by rewards, are less averse to risks, and are more influenced by peers. The same applies to the estimation of health risks relating to smoking—adolescents have a more optimistic attitude regarding their smoking behavior, believing that they "could smoke for a few years and

14

then quit if they wished."[14]

48.     Among adolescents, the use of nicotine is a psychiatric problem that cultivates addictive behaviors by rewiring and interfering with brain development. Several studies indicate that smoking and nicotine exposure during adolescence is associated with disturbances in working memory and attention, as well as reduced prefrontal cortex activation.[15] Studies show that adolescent tobacco and nicotine use are associated with later risk of developing mental and behavioural problems such as major depressive disorder, agoraphobia, panic disorder, addiction to other substances, antisocial personality disorder, and/or academic.[16] Not only does the use of nicotine by adolescents result in a greater level of addiction to nicotine itself, but it increases vulnerability to initiation and subsequent addiction to other drugs.

49.     The adolescent brain is more vulnerable to the effects of nicotine than the adult brain. Adolescents progress faster to nicotine dependence than adults, find nicotine more rewarding, underestimate the risks of smoking, and are more influenced by smoking behavior in their social milieu. Dr. Sharon Levy, director of the Adolescent Substance Use and Addiction Program at

---

[14] Arnett JJ. Optimistic bias in adolescent and adult smokers and non-smokers. Addict Behav. 2000; 25(4): 625-32.

[15] Jacobsen LK, Krystal JH, Mencl WE, Westerveld M, Frost SJ, Pugh KR. Effects of smoking and smoking abstinence on cognition in adolescent tobacco smokers. Biological Psychiatry. 2005;57:56–66; Musso F, Bettermann F, Vucurevic G, Stoeter P, Konrad A, Winterer G. Smoking impacts on prefrontal attentional network function in young adult brains. Psychopharmacology (Berl) 2007;191:159–169.

[16] Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function, Cold Spring Harb Perspect Med. (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069.

Boston Children's Hospital, called the popularity of teen vaping an "entirely predictable problem," given adolescents' vulnerability to nicotine. Levy has treated numerous "vape-addicted" adolescents in her program, showing psychiatric symptoms rarely seen with traditional cigarettes or among adults.

**3.    Tobacco giants marketed an e-cigarette with high nicotine content and sweet flavors**

50.  R.J. Reynolds, the maker of Camel cigarettes, was one of the worst offenders when Big Tobacco was caught marketing cigarettes to youth, infamous for its cartoon character, Joe Camel. Documents from the litigation against Big Tobacco in the 1990s showed that R.J. Reynolds had an explicit policy of targeting youth: Young people "represent tomorrow's cigarette business. . .. As this 14-24 age group matures, they will account for a key share of the total cigarette volume for at least the next 25 years. . .. Our strategy becomes clear for our established brands: 1. Direct advertising appeals      to the younger smokers."[17] Even as recently as 2006, R.J. Reynolds was forced to settle a lawsuit after 41 State Attorneys General sued the company for targeting youth by selling candy, fruit, and alcohol flavored cigarettes in violation of the Master Settlement Agreement.[18] Because these lawsuits have prevented R.J. Reynolds

---

[17] John Mintz & Saundra Torry, Internal R.J. Reynolds Documents Detail Cigarette Marketing Aimed at Children, Wash. Post (Jan. 15, 1998), https://www.washingtonpost.com/wpsrv/national/long term /tobacco/stories/memos1.htm.

[18] Forty-One Attorneys General and R.J. Reynolds Reach Historic Settlement to End the Sale of Flavored, Nat'l Ass'n of Att'ys Gen. (Oct. 11, 2006), https://www.naag.org/naag/media/naagnews/flavored.php.

from advertising cigarettes to youth, it comes as no surprise that it was eager to enter the new, and unregulated, e-cigarette industry.

51.  Reynolds American first launched its e-cigarette, called Vuse, on June 6, 2013, in Colorado.[19] British American Tobacco, at the time, owned 42.2% of Reynolds American. Stephanie Cordisco, the president of Reynold American subsidiary R.J. Reynolds Vapor, announced that this was "a game-changing product in the e-cigarette category" and that the company "plan[ed] to be a large, strong national leader in a very short period of time."[20] Reynolds American President and CEO Daniel Delen added that it was "a fantastic business opportunity for us."[21] Like JUUL, Vuse's marketing focused on its status as a technology product, advertising itself as "the first and only digital vapor cigarette" and "microprocessor controlled."[22]

52.  The investments by Lorillard and Reynolds American in the e-cigarette market expanded it significantly—through a substantial increase in youth e-cigarette use. According to data published by the CDC, current e-cigarette use among middle and high school students tripled from 2013 to 2014.[301] By 2014, 16.2% of high school seniors reported using e-cigarettes within the past thirty days.[302]

---

[19] Dan Mangan, Reynolds American Sees E-Cigarette Launch as a 'Game Changer', CNBC (June 6, 2013), https://www.cnbc.com/id/100796458.

[20] Id.

[21] Id.

[22] Vuse Digital Vapor Cigarette TV Commercial, 'Tomorrow', iSpot.tv (2014), https://www.ispot.tv/ad/7XZ3/vuse-digital-vapor-cigarette-tomorrow (last visited Dec. 9, 2019).

53. But this dramatic increase would itself soon be eclipsed by the runaway success of JUUL's design combined with viral social media marketing. Big Tobacco found itself scrambling to compete with JUUL. As described below, despite knowledge that JUUL's skyrocketing market share came from youth sales, Imperial Brands and Reynolds American were all too happy to copy JUUL's popular design and went after the same customers. Altria did the same with the MarkTen Elite and Apex by MarkTen prior to pulling those products off the shelves as part of its strategy to purchase a nearly $13 billion stake in JUUL.

### 4.    JUUL's Wildly Successful Youth Marketing

54. A major cause of this epidemic is JUUL Labs, Inc., the maker of the JUUL e-cigarette. JUUL entered the e-cigarette market in 2015 and now controls over 70% of it.[23] Over a million JUUL e-cigarettes were sold between 2015 and 2017.[24] JUULs are available at over 12,000 retail stores and online.[25] In 2017, JUUL generated over $224 million in retail sales, a 621% year-over-year increase.[26] By June 2018, sales had skyrocketed another 783%, reaching $942.6 million.[27] The e-cigarette category as a whole grew 97% to $1.96 billion in the same period, largely based

---

[23] Richard Craver, *Juul ends 2018 with 76 percent market share*, Winston-Salem J. (Jan. 8, 2019), https://www.journalnow.com/business/juul-ends-with-percent-market-share/article_6f50f427-19ec-50be-8b0cd3df18d08759.html.

[24] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year*, Bus. Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-onemillion-units-sold-2017-11/.

[25] *Id.*

[26] *Id.*

[27] Angelica LaVito, *Popular e-cigarette Juul's sales have surged almost 800 percent over the past year*, CNBC Health & Sci. (Sept. 11, 2018), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-thepast-year.html.

on JUUL's market success.[28] JUUL's dominance of the e-cigarette market has been so rapid, and so complete, that the act of vaping is now referred to as "JUULing."

55. As JUUL's popularity skyrocketed, Big Tobacco hurried to copy its potent nicotine formulation and youth-oriented design—attempting to capture the same young customers. Defendants Imperial Brands, Reynolds American, and Altria all launched their own pod-based, tech-lookalike products. Meanwhile, Defendant Eonsmoke, LLC ("Eonsmoke") explicitly traded on JUUL's market share, promoting its own products as "JUUL compatible," initiating a successful "Doit4juul" social media campaign, and offering its JUUL-compatible pods with flavors including "Sour Gummy," "Pineapple Crush," and "Pink Lemonade."[29]

96. Juul's market dominance has attracted the attention and alarm of government regulators, including the FDA, the U.S. Surgeon General, and the CDC. On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of its products among youth and demanding that JUUL produce documents regarding its marketing practices.[30]

97. By September 2018, youth vaping rates were spiralling out of control, and the FDA sent warning letters to defendants JUUL and Altria as well as Reynolds American, and Imperial Brands' subsidiary, Fontem Ventures B.V., regarding the alarmingly high rates of youth using

---

[28] *Id.*

[29] Letter from Ann Simoneau, J.D., Director FDA Center for Tobacco Products' Office of Compliance and Enforcement, to Kelly L. Zeller, General Manager, Eonsmoke, LLC ("Eonsmoke LLC Warning Letter") (Oct. 24, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminalinvestigations/warning-letters/eonsmoke-llc-592097-10242019.

[30] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 14, 2018),  https://www.fda.gov/media/112339/download.

their products. [31]

98.    In October 2018, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to the Company's sales and marketing practices.[32] As of October 2019, the FDA, the Federal Trade Commission, multiple state attorney generals and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JUUL's role in the youth vaping epidemic and whether JUUL's marketing practices purposefully targeted youth.

99.    The decline of cigarette use and the rise of JUUL are far from coincidence. The Company was founded by Adam Bowen and James Monsees, both product designers by education and experience. Bowen and Monsees met in Stanford University's famed graduate product design program, where the first iteration of JUUL was their final project.[33] Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[34]

100.    Years of litigation, regulation, and education by public health advocates, the medical

---

[31] Letter from Scott Gottlieb, M.D., FDA Commissioner, to Kevin Burns, JUUL Labs, Inc. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[32] Laurie McGinley, *FDA seizes Juul e-cigarette documents in surprise inspection of headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documentssurprise-inspection-headquarters/.

[33] Julia Belluz, *The Vape Company Juul Said It Doesn't Target Teens. Its Early Ads Tell a Different Story*, Vox (Jan. 25, 2019), https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing.

[34] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Sept. 7, 2019).

community, and elected officials against Big Tobacco had severely tarnished the popularity of cigarettes. Monsees and Bowen thus set out to "deliver [] solutions that refresh the magic and luxury of the tobacco category."[35] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." [36] Seeking to recreate the lost "ritual and elegance that smoking once exemplified," Monsees set out to re-design the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[37] In essence, the objective of JUUL was to build a newer, more attractive cigarette. One that could addict a new generation of smokers. By design, a cornerstone of the product's commercial success is its addictive nature.

101.    JUUL is, in many ways, the paradigmatic start-up. It has all the markings of Silicon Valley success: staggering profit margins, meteoric growth, and status as a cultural phenomenon. The Silicon Valley-savvy company used the framework and ideology of start-up culture to catapult itself to success by every metric in the start-up industry. In 2018, JUUL's gross profit margins were 70%[38] and it represented 76.1% of the national e-cigarette market.[39] It shattered

---

[35] *Onboardly Interview with Ploom Cofounder and CEO James Monsees*, Pax.com (Apr. 30, 2014),

https://www.pax.com/blogs/press/onboardly.

[36] *Id.*

[37] *Id*.

[38] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, Axios (July 2, 2018),

https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[39] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market 2*, Stanford Res. into the Impact of Tobacco Advert. (2019) ("Juul Advertising"),

(footnote continued)

previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months, or four times faster than Facebook.[40] This all came just three years after its product launch.

102.    JUUL's staggering commercial success didn't come from a blank slate. Under the Master Settlement Agreement between Big Tobacco and the States, the public has access to hundreds of thousands of Big Tobacco's internal documents. In creating JUUL, Monsees and Bowen carefully studied the marketing strategies, advertisements, and product design of Big Tobacco. As Monsees candidly acknowledged, the internal tobacco documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch-up, right, to a huge, huge industry in no time. And then we started building prototypes."[41]

103.    Some of the Big Tobacco records that Monsees and Bowen reviewed document how to manipulate nicotine pH to maximize nicotine delivery in a vapor while minimizing the "throat hit" that may potentially deter new smokers. Other records relate to tobacco industry market strategies and advertisements designed to lure non-smoking youth. Monsees and Bowen were able to take advantage of an extensive online tobacco advertising research database maintained by the Stanford Research into the Impact of Tobacco Advertising ("SRITA"), an inter-disciplinary research group devoted to researching the promotional activities of the tobacco industry. SRITA's database contains approximately 50,000 original tobacco advertisements.

---

http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[40] Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status,* Yahoo! Fin. (Oct. 9, 2019), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.

[41] Montoya, *supra*

According to Monsees, JUUL's advertising was informed by traditional tobacco advertisements, and SRITA in particular had been very useful to JUUL.[42]

104.    Put simply, the marketing and product design of the JUUL e-cigarette, and its incredible commercial success, are based upon tactics and strategies developed by Big Tobacco. As set forth below, while Big Tobacco was prohibited from employing these tactics and strategies to market traditional cigarettes by virtue of the Master Settlement Agreement and subsequent regulations, JUUL followed the same strategy.

### 5.   Big Tobacco and E-Cigarettes

105.    While JUUL revolutionized and dominated the e-cigarette market, it did not create the first one. Prior to JUUL, Big Tobacco was also heavily involved in the manufacture and promotion of e-cigarettes. Altria has been one of the biggest losers in the fight against smoking. Altria estimates that the cigarette industry declined by -4% in 2017 and by -4.5% in 2018. For 2019 through 2023, Altria estimated for the average annual U.S. cigarette industry volume declines is -4% to -5%.[43] Altria later revised this estimate in the second quarter of 2019 from 4-5% to 4-6%, in light of efforts to increase the legal age for cigarette smoking to 21.[44]

106.    In the face of these numbers, Altria turned to e-cigarettes, along with other "non-

---

[42] Jackler, Juul Advertising at p. 27.

[43] *Presentation for Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.

[44] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Business (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.

combustible products," to "enhance" its business platform.[45] Altria boasted to shareholders that it "aspire[d] to be the U.S. leader in authorized, non-combustible, reduced-risk products."[46]

107.    Altria entered the e-cigarette market with a cigarette-lookalike, or "cigalike," style of e-cigarette, sold under the brand MarkTen. Following a phased roll-out of MarkTen in Indiana and Arizona in late 2013, Altria launched the MarkTen nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for Imperial Tobacco's e-vapor product, blu.[47]

---

[45] *Presentation    for    Altria's    Second-Quarter    2019    Earning    Conference    Call*, Altria (July 30, 2019), http://investor.altria.com/Cache/1001255076.PDF?O=PDF&T=&Y=&D=&FID=1001255076&iid=4087349.

[46] *Presentation for Annual Meeting of Shareholders*, Altria (May 17, 2018), http://investor.altria.com/Cache/1500113050.PDF?O=PDF&T=&Y=&D=&FID=1500113050&iid=4087349.

[47] Cantrell, Jennifer & Emelle, Brittany & Ganz, Ollie & Hair, Elizabeth & Vallone, Donna. (2015). *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*. Tobacco Control. 25. 10.1136/tobaccocontrol-2015-052532.



108.    E-cigarette advertising spending for 2014 totalled $88.1 million, a 52 percent increase from 2013.[48] Of that $88.1 million spent in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[49]

109.    Altria's MarkTen advertising tagline, "Let It Glow," was criticized by public health advocates for playing off Disney's popular children's movie "Frozen" and its hit song "Let it go."[50]

---

[48] *Id.*

[49] *Id.*

[50] Matt Richtel, *A Bolder Effort by Big Tobacco on E-Cigarettes*, NY TIMES (June 17, 2014), https://www.nytimes.com/2014/06/17/business/a-bolder-effort-by-big-tobacco-on-e-cigarettes.html.



110.    Even the then-president of R.J. Reynolds Vapor Company, Stephanie Cordisco, criticized Altria for irresponsible marketing, calling this tagline    "terrible" and saying that the companies "running the most irresponsible campaigns are the ones who know better."[51] At the time, the president of the Campaign for Tobacco-Free Kids said that companies like Altria were



[51] *Id.*

using "exactly the same themes we saw work with kids in the U.S. for decades with cigarettes."[52]

111.    Although free samples of tobacco products are prohibited under the terms of the Tobacco MSA as well as FDA regulations issued in 2010, Altria took advantage of the grey area in the regulation of e-cigarettes and distributed coupons for free sample nicotine cartridges as part of its MarkTen launch. (The FDA has since issued finalized guidance clarifying the scope of the ban on distributing free samples or coupons for e-cigarettes or components.)

112.    Altria also took full advantage of its distribution network, reaching 60,000 stores in a month.[53] In Arizona, for example, Altria's distribution network allowed MarkTen to achieve a 48% e-cigarette market share in just seven weeks after launch, according to then-CEO Marty Barrington's statements on an earnings call.[54] Altria was clear in its intent to dominate the e-cigarette market as it has the traditional cigarette one: "We are the market leader today and we will continue to be," Barrington told investors.[55]

113.    Altria began acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style.[56] In 2017, Altria acquired a vape product called Cync, from Vape Forward. Cync is a small vapor device that uses pre-filled pods, similar to JUUL. It also made a minority investment in Avail Vapor, one of the largest

---

[52] Id.

[53] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[54] Id.

[55] Id.

[56] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall Street Journal (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378.

vape store chains in the U.S., which also produces and sells its own branded e-liquids for so-called open-system devices, which are refillable.[57]

114.    In February 2018, Altria announced that it would enter the closed-tank market with the MarkTen Elite: "a pod-based product with a premium, sleek battery design" and having the "convenience of prefilled, magnetic click pods." At an analyst conference in February 2018, former Altria chief Marty Barrington boasted that the Elite's pods held more than twice as much liquid as JUUL's.[58]



115.    Altria quickly followed with another pod-based product, the Apex by MarkTen.

_____

[57] Timothy S. Donahue, *At the Forefront,* Tobacco Reporter (Dec. 1, 2017), https://www.tobaccoreporter.com/2017/12/at-the-forefront/.

[58] Marty Barrington, *Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, Chief Executive Officer (CEO) and President, and other members of Altria's senior management team*, US SEC (Feb.21, 2018), https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm.



116.    Because e-cigarettes are subject to more relaxed regulation than cigarettes, Altria was able to market its products in ways it could not have done for traditional tobacco products. Altria marketed its e-cigarettes in flavors that would appeal to youth: Strawberry Brulee, Apple Cider, Hazelnut Cream, Spiced Fruit, Piña Colada, Glacier Mint, and Mardi Gras - a mixed berry flavor. Most of these flavors were marketed with the Elite and Apex products, Altria's "pod" e-cigarettes.

117.    Altria's push to gain the youth market gained the attention of the FDA. On September 12, 2018, the FDA sent a warning letter to Altria, requesting that Altria respond with a "detailed plan" to address and mitigate the widespread use of its e-cigarette products by minors.[59] Due to the "epidemic rate of increase in youth use" of e-cigarettes, the FDA had recently conducted an "enforcement blitz" of retailers nationwide and confirmed that Altria' MarkTen products were being sold to minors. The FDA did not mince words, telling Altria that "[t]his is unacceptable, both legally and as a matter of public health." The FDA warned Altria that it has a responsibility to ensure minors are not getting access to its products and that it was "crucial" that manufacturers like Altria take steps to prevent youth from using its products. First and foremost,

---

[59] Scott Gottlieb, *Letter to Altria Client Services*, U.S. Food and Drug Admin. (Sep. 12, 2018),

https://www.fda.gov/media/119666/download.

the FDA asked Altria to "take prompt action to address the rate of youth use of MarkTen products." The FDA suggested that Altria could revise its current marketing practices, eliminate online sales, and remove flavored products from the market. The FDA's expectation and motivation were clear: "steps must be taken to protect the nation's young people."

118.   On October 25, 2018, Altria responded to the FDA, claiming to have "serious concerns" about youth access to e-vapor products.[60] It admitted that the use of e-cigarettes by youth had risen to "epidemic levels." In response, Altria agreed to remove its pod-based e-cigarettes from the market and stop selling any flavored traditional e-cigarettes other than tobacco, menthol, and mint. It acknowledged that "[b]ased on publicly-available information from FDA and others, we believe pod-based products significantly contribute to the rise in youth use of e-vapor products. We don't believe our products are the issue, but we don't want to risk contributing to the problem." Altria's letter went on to disclaim a numerous of practices that it associated with marketing to youth strategies that were key components of JUUL's marketing strategy. Altria specifically identified the use of flavors that go beyond traditional tobacco flavors, digitally advertising on websites with a large percentage of youth visitors, using social media to promote the brand, allowing online purchases and promotional sign-ups without age verification, advertising e-cigarettes on billboards, advertising with models who appear to be under 25 years old, distributing branded merchandise, and paying celebrities or other third parties to market or use a particular brand's e-cigarette. Altria also claimed to support "banning vaping in schools" in      order to reduce "social access." Altria ended the letter by committing to

---

[60] Howard A. Willard, *Letter to Scott Gottlieb, Commissioner*, Altria (Oct. 25, 2018), http://www.altria.com/AboutAltria/Federal-Regulation-of-Tobacco/Regulatory-Filing/FDAFilings/Altria-Response-to-FDA-E-vapor-October-25-2018.pdf.

"reverse the current use trend among youth."

119.    Less than two months later, Altria changed its course.. On December 20, 2018, Altria announced that it would be making a $12.8 billion dollar investment in JUUL, the biggest equity investment in United States history.[61] The deal gave Altria a 35% stake in JUUL.

**6.    JUUL and Altria Join Forces to Protect JUUL's Market Share**

120.    By the fall of 2018, JUUL was under intense scrutiny. A group of eleven United States senators wrote JUUL's CEO, Kevin Burns, a letter in April 2018, declaring that the JUUL device and JUULpods "are undermining our nation's efforts to reduce tobacco use among youth and putting an entire new generation of children at risk of nicotine addiction and other health consequences."[62]

121.    Less than a week later, then FDA Commissioner Gottlieb announced a crackdown on retailers to limit youth access to e-cigarettes and enforcement actions against  JUUL in particular.[63] At the same time, the FDA sent JUUL a request for documents relating to

---

[61] Cromwell Schubarth, *Vaping Unicorn Juul Opens Lab in Mountain View Amid Furor in S.F.,* Silicon Valley Bus. J. (Feb. 5, 2019), https://www.bizjournals.com/sanjose/news/2019/02/05/juul-opens-lab-in-mountain-view.html.

[62] Richard Durbin et al., *Letter from 11 U.S. Senators, to Kevin Burns, CEO of JUUL Labs, Inc.,* United States Senate (April 18, 2018), https://www.durbin.senate.gov/imo/media/doc/JUUL%20Letter%20-%20S%20IGNED.pdf.

[63] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on new enforcement actions and a Youth Tobacco Prevention Plan to stop youth use of, and access to, JUUL and other e-cigarettes (April 23, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-newenforcement-actions-and-youth-tobacco-prevention?utm_campaign=04242018_Statement_Youth%20Tobacco%20Prevention&utm_medium=email&utm_source=Eloqua.

marketing, product design, and public health impact.[64] In July 2018, Massachusetts Attorney General Maura Healey announced an investigation into JUUL regarding marketing and sale to minors.[65] In September 2018, FDA Commissioner Gottlieb called youth vaping an "epidemic" and sent letters to JUUL, Altria, and other e-cigarette manufacturers demanding a plan to reduce youth use.[66] Then, in October 2018, as alleged above, the FDA raided JUUL's headquarters and seized more than a thousand documents relating to JUUL's sales and marketing practices.[67]

122.    On November 13, 2018, JUUL responded with an "Action Plan," declaring its intent to stop selling certain flavors in brick-and-mortar stores, restrict purchases of those flavors on the JUUL website to adults age 21 and over, and shut down its social media accounts.[68]

123.    As the pressure on JUUL intensified, Altria stepped in to assist. Despite the clear criticism of JUUL's conduct in its October 25th letter to the FDA, Altria announced its $12.8 billion investment in JUUL on December 20, 2018.[69]Altria characterized its investment as one intended to "accelerate harm reduction and drive growth."[70] In an investor presentation in 2019,

---

[64] Id.

[65] Press Release, Office of Attorney General Maura Healey, AG Healey Announces Investigation into JUUL, Other Online E-Cigarette Retailers Over Marketing and Sale to Minors (July 24, 2018), https://www.mass.gov/news/aghealey-announces-investigation-into-juul-other-online-e-cigarette-retailers-over-marketing.

[66] See https://www.fda.gov/tobacco-products/rules-regulations-and-guidance/ctp-letters-industry#youth-access

[67] See Letter From US FDA to Kevin Burns, supra note 19.

[68] https://newsroom.juul.com/juul-labs-action-plan/

[69] https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUULAccelerate

[70] Id.

Altria described JUUL as having a "unique and compelling product" and included the following graphic:[71]



124.    But as the president of the Campaign for Tobacco-Free Kids observed upon announcement of the deal, "Altria has no interest in seriously reducing the number of people who smoke cigarettes."[72]

125.    Altria would not have made such an investment if it did not intend to grow JUUL's already enormous market even more. In fact, Altria said as much when announcing its investment, explaining that its investment in JUUL "enhances future growth prospects" and committing to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency."[73] Since the deal was inked in December 2018, Altria's actions have clearly helped JUUL maintain, if not expand, its market share—a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and

---

[71] Altria Group, Inc. 2019 CAGNY Investor Presentation, Available at

http://investor.altria.com/Cache/1500117496.PDF?O=PDF&T=&Y=&D=&FID=1500117496&iid=4087349

[72] https://www.nytimes.com/2018/12/20/health/juul-reaches-deal-with-tobacco-giant-altria.html

[73] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire

(Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-

JUUL-Accelerate

advertising practices that contributed to youth vaping. Altria's Second Quarter 2019 Earnings Call reported that JUUL continued to grow in the first half of 2019, from a 33% category share in 2018 to 48% by the second quarter 2019. JUUL's expected revenue for 2019 is $3.4 billion, nearly triple what it was in 2018.[74]

126.    From JUUL's beginnings, Altria had "followed Juul's journey rather closely." [75] Altria Chairman and CEO Howard Willard said that, for years, his company "watched Juul carefully to see if it had staying power."[76] Altria decided it did. As Willard explained: "During 2018, we concluded that JUUL had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential." [77] This was enough for Altria, one of the world's largest producers and marketers of tobacco products, to call JUUL's alleged smoking cessation device a "terrific product" and take a 35% stake in the Company with its $12.8 billion investment.[78] With this investment, Altria now owns both the number one youth initiation cigarette in the United States (the Marlboro cigarette) and the number one youth initiation e-cigarette in the United States, JUUL.

_____

[74] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketingsales-of-3-4-billion-despite-flavored-vape-ban.

[75] Altria Group, Inc., Current Report (Form 8-K), Ex. 99.1 (Feb. 20, 2019), https://www.sec.gov/Archives/edgar/data/764180/000076418019000018/exhibit991-2019cagnyremarks.htm at 4.

[76] *Id.*

[77] *Id.*

[78] Angelica LaVito, *E-Cigarette Sales Are Booming Thanks to Juul*, CNBC (Aug. 21, 2018), https://www.cnbc.com/2018/08/21/e-cigarette-sales-are-booming-thanks-to-juul.html.

127.    Notwithstanding Altria's statements to the FDA just two months previously about its concerns that JUUL was marketing and advertising its products in a way that contributed to the youth vaping epidemic, Willard stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[79] Altria committed to applying "its logistics and distribution experience to help JUUL expand its reach and efficiency" and offering JUUL the support of

> "Altria's sales organization, which covers approximately 230,000 retail locations." It also gave JUUL access to its "premier" retail shelf space while allowing it to continue to sell its flavored products online and provided JUUL with access to the databases of all of Altria's companies. According to Willard, Altria was "excited to support JUUL's highly-talented team and offer [Altria's] best-in-class services to build on their tremendous success." Altria admitted that minors were using JUUL products and that "underage use of e-cigarette products is a problem." Nevertheless, it believed its investment in JUUL "strengthens its financial profile and enhances future growth prospects."

128.    Altria's decision to prioritize profits over the dangers of youth vaping did not go unnoticed. On February 6, 2019, former FDA Commissioner Scott Gottlieb, sent Altria another letter "regarding representations" made by Altria acknowledging that it "has an obligation to take action to help address the mounting epidemic of youth addiction to tobacco products."[80]

---

[79] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[80] Scott Gottlieb, *Letter to Howard Willard*, U.S. Food and Drug Admin. (Feb. 6, 2019),
(footnote continued)

Commissioner Gottlieb told Altria that its recent purchase of a 35% ownership of JUUL "contradicts        [s] the commitments you made to the FDA." The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

129.    The companies met with Gottlieb in March 2019 in a meeting the Commissioner described as "difficult."[81] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JUUL, and instead sa[id] it looks like a business decision." Just a few weeks later, Gottlieb resigned his position.

130.    As mentioned above, Altria's investment in JUUL is not only a financial contribution. Altria is working to actively help run JUUL's operations and expand JUUL's sales. Altria's investment brings legal and regulatory benefits to JUUL, by helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. Altria also brings lobbying muscle. In addition, Altria's arrangement with JUUL gives JUUL greater access to retail. JUUL has been in 90,000 US retail outlets, while Altria reaches 230,000 US outlets. Altria brings its logistic and distribution experience. Importantly, Altria gives JUUL access to shelf space—and not just shelf space, but space near Altria products and

---

https://www.fda.gov/media/122589/download.

[81] Kate Rooney and Angelica LaVito, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul,* CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficultmeeting-on-juul.html.

retail displays. The arrangement allows JUUL's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

131.    Altria is closely intertwined with JUUL. Not only does Altria's investment also allow it to appoint a third of JUUL's board, but in the last month, JUUL's CEO resigned to be replaced by a career Altria executive, K.C. Crosthwaite. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work, including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite is a career Altria executive who knows Big Tobacco's playbook all too well, having previously served     as the president and CEO of Philip Morris USA, the vice president and general manager at Marlboro, and the vice president of strategy and business development at     Altria Client Services LLC.

132.    This arrangement was profitable for both companies. JUUL employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[82] and Altria received millions of teen customers.

133.    JUUL claims its mission is to "improve the lives of the world's one billion adult smokers by eliminating cigarettes" and its advertising now encourages "making the switch."[83] Similarly, Altria's CEO Howard Willard claimed that it invested in JUUL to help "switching

---

[82] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[83] *Our Mission*, JUUL Labs (2019), https://www.juul.com/mission-values.

adult smokers" and "reduce harm."[84] But JUUL does not have FDA approval as a cessation device. This may be because, as one Company engineer said: "We don't think a lot about addiction here because we're not trying to design a cessation product at all … anything about health is not on our mind."[85]

134.    JUUL also does not have authority to claim that its product is healthier than cigarettes. On September 9, 2019, the FDA warned JUUL that has violated federal law by making unauthorized representations that JUUL products are safer than cigarettes.[86]

135.    Moreover, even if JUUL were to obtain FDA approval as a legitimate smoking cessation device, this has no impact—and certainly does not excuse—the Defendants' conduct that targets youth. Regardless of the potential health benefits to chain smokers from switching to vaping from smoking, there is no benefit to kids from starting to vape.

136.    A key part of revenue growth like JUUL's is addicting youth to nicotine, as the tobacco industry has long known. Beginning in the 1950s, JUUL's now corporate affiliate, Philip Morris, intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.[87] Philip Morris

---

[84] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[85] Nitasha Tiku, *Startup Behind the Lambo of Vaporizers Just Launched an Intelligent e-Cigarette*, The Verge (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.

[86] *Juul Labs, Inc. Warning Letter*, U.S. Food and Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspectionscompliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

[87] Amended Final Opinion at 972, *U.S. v. Philip Morris*, No. 99-cv-2496 (D.D.C. Aug. 17, 2006).

knew that youth smoking was essential to the tobacco industry's success and longevity, as an internal Philip Morris document makes clear: "It is important to know as much as possible about teenage smoking patterns and attitudes. Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[88] For this reason tobacco companies focused on the 14-24 year-old age group, because "young smokers have been the critical factor in the growth" of tobacco companies and the 14-18 year-old group is an increasing segment of the smoking population.[89] As the Vice-President of Marketing at R.J. Reynolds Tobacco Company ["RJR"] explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years."[90] RJR's now-infamous Joe Camel "ambassador of Cool" advertising campaign, which ran from 1988 through 1997, exemplifies the importance the tobacco industry placed on hooking young smokers early:[91]

_____

[88] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

[89] *Id.*

[90] C.A. *Tucker, Marketing Plans Presentation to RJRI B of D*, Truth Tobacco Industry Documents, U. of S.F. (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

[91] *Joe Camel: Character of the Year Advertisement*, Stanford U. Res. into the Impact of Tobacco Advert. (1990), http://tobacco.stanford.edu/tobacco_main/images.php?token2=fm_st138.php&token1=fm_img4072.php&theme_file=fm_mt015.php&theme_name=Targeting%20Teens&subtheme_name=Joe%20Camel.



### 7. The Secret to JUUL's Success: Hooking Kids

137.    It is clear that JUUL, like Philip Morris and RJR before it, targeted youth as a key business demographic. A recent study showed that 15-17-year-olds are 16 times more likely to use JUUL than 25-34-year-olds.[92]

138.    Indeed, JUUL was well aware from the beginning that its products would appeal to youth. A former JUUL manager, who spoke to *The New York Times* on the condition that his

---

[92] D.M. Vallone et al., *Prevalence and correlates of Juul use among a national sample of youth and young adults*, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

name not be used because he worried about facing the ire of the company, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes 10 or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[93]

139.    This "suspicion" has been confirmed by the U.S. Surgeon General, who found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18 years old.[94]

140.    Because of Big Tobacco's demonstrated effectiveness at addicting youth to nicotine, cigarette manufacturers operate under tight restrictions regarding their advertising and marketing activities. By way of example, cigarette companies may not:

    A.  use outdoor advertising such as billboards;

    B.  sponsor events;

    C.  give free samples;

    D.  pay any person to "use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media;"

---

[93] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?* N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[94] Adams, *supra*

E.  pay any third party to conduct any activity which the tobacco manufacturer is prohibited from doing; or

F.  sell "flavored" cigarettes.

141.  All of these above activities were prohibited because of their effectiveness at appealing to youth. As described below, all of these activities figured prominently in JUUL's marketing campaign.

142.  According to Dr. Robert Jackler, an otolaryngologist and professor at Stanford University School of Medicine and principal investigator for SRITA, JUUL's initial marketing was patently youth oriented."[95] The JUUL's 2015 ad campaign, called "Vaporized" was designed to create a "cult-like following."[96] Its imagery featured a vivid color scheme and models in their twenties in poses that researchers note are evocative of behaviors more characteristic of underage teens than mature adults.[97] Dr. Jackler and his colleagues found it "clear" that this imagery resonated with underage teens who aspire to emulate trendsetting young adults.[98]

143.  Tobacco advertisers have long understood that teens are attracted to such imagery. The Vaporized campaign was featured on the front page of VICE magazine, "the #1 youth media

---

[95] Robert K. Jackler, *The Role of the Company in the Juul Teen Epidemic, Testimony of Robert Jackler before the House Subcommittee on Economic and Consumer Policy* (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Jackler%20Testimony.pdf at 2 ("Jackler Testimony").

[96] *Id*. at 4.

[97] Jackler *et al., supra*

[98] *Id*. at 7.

company in the world."[99] In the summer of 2015, an animated series of Vaporized billboards, with the campaign's youth-appealing imagery, were displayed in New York's Times Square.[100]

144.    Over the first year after JUUL launched its ad campaign in June 2015, it held a series of at least 50 highly stylized parties, typically with rock music entertainment, in cities across the United States.[101] Thousands of young people were given free nicotine-filled JUULpods (appropriately named "JUUL starter kits"), and JUUL posted photos of various young people enthusiastically puffing on JUULs across their social media channels.[102] JUUL also featured popular stars such as Katy Perry holding a JUUL at the Golden Globes.[103] [104] [105]

_____

[99] *Id*. at 5.

[100] *Id.*

[101] *Id*. at 3

[102] *Id.*

[103] *Jackler Testimony* at 8.

[104] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018),

https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketingcampaigns/#3da1e11b14f9.

[105] *Id.*

 

145.   JUUL knew these images would be successful in achieving this result because it intentionally crafted them to mimic specific traditional tobacco advertisements that Big Tobacco had used to target teens. In fact, many of JUUL's ads are nearly identical to old cigarette ads that were designed to get teens to smoke. Like its Big Tobacco predecessors, Juul's initial marketing focused on colorful ad campaigns using eye-catching designs and youth-oriented imagery with themes of being cool, carefree, stylish, attractive, sexy, and popular—unusual themes and images if one's objective is to promote an adult's only smoking cessation device.

146.   Examples of the insidious marketing tactic directed at youth customers[106] [107]:

---

[106]*Virginia Slims vs Juul Advertisement*, Stanford U. Res. into the Impact of Tobacco Advert. (2015), http://tobacco.stanford.edu/tobacco_main/images-comp.php?token2=fm_tn_st328.php&token1=fm_tn_img10799.php&theme_file=fm_tn_mt035.php&theme_name=Cigs%20vs.%20eCigs&subtheme_name=Cigs%20vs%20eCigs%20JUUL.

[107] Belluz, *supra*.

147.    JUUL used Big Tobacco's advertising imagery, but coupled it with a modern, state-of-the-art marketing campaign designed to target youth. It relied heavily on social media, crafting a powerful online presence, which persists even after JUUL deleted its accounts in the face of mounting public scrutiny. JUUL was particularly active on Instagram, which is the most popular social media site among teens.[108]

148.    JUUL cultivated hashtags, allowing the Company to  blend its ads in with a wide range of user content, increasing exposure while concealing the commercial nature of the content.[109] JUUL then used hashtags to reinforce the themes it crafted in its product design, like #style, #technology, #smart, and #gadget. JUUL's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, "#Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand

[108] Jackler *et al.,supra*.

[109] *Id*. at 23.

name."[110]

149.    Even after JUUL halted its own social media posts in November 2018, viral peer-to-peer promotion among teens insured continued corporate and product visibility among youth.[111] In fact, community posts about JUUL increased after JUUL itself quit social media in the fall of 2018. Prior to November 2018, over a quarter of a million posts appeared. In the eight months after JUUL halted its promotional postings, the rate of community postings increased significantly, resulting in the number of posts doubling to over half a million.[112]

JUUL also paid social media influencers to post photos of themselves with JUUL devices and to use the hashtags that it was cultivating.[113] JUUL entered a contract with an advertising agency specifically to identify and recruit social media influencers that had at least 30,000 followers to, according to an internal JUUL email, "establish a network of creatives to leverage as loyalists" for the

---

[110] Jackler Testimony at 10.

[111] *Id.* at 11.

[112] *Id.*

[113] Jackler et al., *Juul Advertising Over Its First Three Years On The Market*, Stanford Res. into the Impact of Tobacco Advert. (Jan. 31, 2019), *supra*.

JUUL brand.[114] One such influencer was Christina Zayas, who JUUL paid $1,000 for just one blog post and one Instagram post in the fall of 2017. [115]



150. JUUL instituted an "affiliate program" to recruit those who authored favorable reviews of its products by providing such reviewers with a 20% discount of purchases of JUUL products.[116] It even recruited JUUL users to act as part of their marketing team by asking users to

---

[114] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges,* Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#57735a4a33e2.

[115] Michael Nedelman et al., *#Juul: How social media hyped nicotine for a new generation,* CNN Health (Dec. 19, 2018), https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

[116] *Id.* at 9-10.

"refer a friend and get a discount."[117]

151.    Such tactics masked what were in fact JUUL advertisements as user content, further increasing exposure and ultimately solidifying the company in teen pop culture as a form of cultural currency. JUUL's strategy was so successful in embedding its products into pop culture that it entered the vernacular as a verb. The JUUL device and the term "juuling" are so pervasive that JUUL effectively eliminated not only competitors, but also any potentially alarming terms like "smoking" or "e-cigarette," which could alert users of the true nature of the device or activity. A recent study found that 63% of adolescent JUUL users did not know that JUULpods contain nicotine.[118] This has worked to JUUL's advantage and was in fact a deliberate part of its strategy. In the first year after its launch, not one of JUUL's 171 promotional emails said anything about nicotine content,[119] and it did not include nicotine warnings on the JUUL packaging until August 2018, when it was forced to do so.

152.    The design of JUUL's product is also acutely attractive to youth. Unlike most of its predecessors, JUUL looks nothing like a cigarette. Instead, JUUL is sleek and linear and seems like the latest tech invention. This is not surprising, given the founders' Silicon Valley product design education and training. The evocation of technology makes JUUL devices      familiar and desirable to the younger tech-savvy generation, particularly teenagers. The JUUL device even has features reminiscent of youth-oriented tech culture and gaming, like "secret" features users

---

[117] *Id*. at 9.

[118] *Juul e-Cigarettes Gain Popularity Among youth, But Awareness of Nicotine Presence Remains Low*, Truth Initiative (Apr. 18, 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/JUUL-E-cigarettes-Gain-Popularity-Among-Youth-But-Awareness-of-Nicotine-Presence-Remains-Low.pdf.

[119] Jackler *et al., supra*

can unlock, such as making the indicator light flash rainbow colors in "party mode." JUUL has been so successful in emulating technology that the small, rectangular devices are often mistaken for—or passed off as—flash drives.

153.    The ability to conceal a JUUL is also part of the appeal for adolescents. The devices are small and slim, so they fit easily in a closed hand or a pocket. The ease and simplicity of use—there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools. Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[120]

154.    JUUL also created special flavors that make its addictive, high-tech device even more attractive to adolescents. Tobacco companies have known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson memorandum: "Youth Cigarette – New Concepts," specifically noted the "well known fact that teenagers like sweet products."[121]

155.    A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers"

---

[120] Evie Blad, *'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know,* Educ. Wk. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.

[121] September 1972 memorandum to Brown & Williamson from Marketing Innovations, "Youth Cigarette -New Concepts." Bates No. 170042014.

candy company to determine which flavors enjoyed the widest appeal among youth.[122] According to 2004 data, 17 year old smokers were more than three times likely as those over 25 to smoke flavored cigarettes and viewed flavored cigarettes as safer.[123] For this reason, in 2009 the FDA banned flavored cigarettes pursuant to its new authority under the Family Smoking Prevention and Tobacco Control Act of 2009. In announcing the ban, FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regulator smokers."[124]

156.    In fact, a 2017 study of the cigarette flavor ban found that the ban was effective in lowering the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[125] According to the Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[126] Studies also

---

[122] Lorillard memo on sale of Newport cigarettes, 1978 Bates No. 03537131 - 03537132EXHIBIT101.

[123] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009) https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[124] *Id.*

[125] https://tobacco.ucsf.edu/more-evidence-support-eliminating-flavors-reduce-youth-cigarette-and-e-cigarette-use; referencing Courtemanche, Charles J. et al. Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use, American Journal of Preventive Medicine 2017; 52(5):e139 - e146; and MB. Harrell, et al. Flavored e-cigarette use: Characterizing youth, young adult, and adult users. Prev Med Rep. 2017; 5: 33–40. Published online 2016 Nov 11. doi: 10.1016/j.pmedr.2016.11.001 PMCID: PMC5121224.

[126] E-Cigarette Use Among Youth and Young Adults, U.S. Dept. of Health and Human Services (2016), https://www.ctclearinghouse.org/Customer-Content/www/topics/2444-E-Cigarette-Use-Among-Youth-And-Young-Adults.pdf (accessed Oct. 4, 2019).

show that flavors motivate e-cigarette initiation among youth,[127] and that youth are much more likely to use flavored tobacco products than adults are.[128] In fact, in September 2019, the State of Michigan banned flavored e-cigarettes, a step the governor said was needed to protect young people from the potentially harmful effects of vaping, Governor Andrew Cuomo of New York announced that he would pursue emergency regulations to ban the sake of flavored e-cigarettes, and Governor Jay Inslee of State of Washington ordered the State of Washington Department of Health to ban all flavored vapor products.[129, 130] Despite JUUL's claims that its target market is adult smokers, the Company entered the market with flavors like Cool Mint, Crème Brulee, Fruit Medley, Cucumber, and Mango. These flavors were the reason countless adolescents started using JUUL products. [131]

---

[127] Karl Paul, *Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows,* MarketWatch (Feb. 26, 2019),

https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addictionstudy-shows-2019-02-25.

[128] AC Villanti et al., *Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study*, 53

Am. J. of Preventative Med. 139 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28318902.

[129] Jesse McKinley & Christina Goldbaum, *New York Moves to Ban Flavored E-Cigarettes by Emergency Order*, N.Y.Times

(Sept. 15, 2019), https://www.nytimes.com/2019/09/15/nyregion/vaping-ban-ny.html?smid=nytcoreios-share.

[130] https://www.governor.wa.gov/sites/default/files/19-03%20-

%20Addressing%20the%20Vaping%20Public%20Health%20Crisis%20%28tmp%29.pdf?utm_medium=email&utm_source=govdelivery

[131] Chaykowski, *supra*.



157.    The flavors pose dangers beyond luring young people into trying nicotine. Studies now show these sweet and fruity flavors present distinct additional health hazards. Researchers have found that some of the chemicals JUUL uses for flavor and perfume—particularly in the Crème Brulee flavor—contain relatively high levels of acetals.[132] Acetals are airway-irritating chemicals that may cause lung damage.[133] Dr. Robert Jackler said that test results have shown that JUUL's sweet and fruity flavors "contribute to the increasing body of evidence documenting

---

[132] Susie Neilson, *Irritating Compounds Can Show Up in 'Vape Juice'*, NPR (July 30, 2019), https://www.npr.org/sections/health-shots/2019/07/30/746238009/irritating-compounds-discovered-in-vape-juice.

[133] *Id.*

toxicological effects of e-cig vapor."[134]

### 8.   Youth Addiction: The Cost of JUUL's Success

158.   In addition to designing its devices to be particularly attractive to youth, JUUL designed its devices to be highly addictive. Unlike most other e-cigarettes, which use freebase nicotine, JUUL uses patented nicotine salts from which it makes liquid nicotine cartridges, or JUULpods.[135] Each JUULpod is, according to the Company, the equivalent of a pack of cigarettes. Each pod contains an alarming amount of nicotine, with up to 59 mg per ml—an amount that is roughly three times the amount of nicotine that can be sold to consumers in the European Union in a JUULpod. On top of ramping up the amount of nicotine, JUULpods enabled the Company to increase the rate and amount of nicotine delivery to the JUUL user, roughly doubling the concentration and tripling the delivery speed of nicotine of the average e-cigarette.[136]

159.   Big Tobacco spent decades manipulating nicotine in order to foster and maintain addiction in their customers. RJR developed and patented nicotine salt additives, including nicotine benzoate, to increase nicotine delivery in cigarette smoke. The objective was to provide an additional "nicotine kick" based on increased nicotine absorption associated with lower pH. JUUL uses this very same concept for its market-dominating e-cigarettes. The Company's patent

---

[134] *Id.*

[135] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electroniccigarettes-myblu-vuse-markten.

[136] *How Much Nicotine is In Juul?*, Truth Initiative (Feb. 26, 2019), https://truthinitiative.org/researchresources/emerging-tobacco-products/how-much-nicotine-juul.

for its nicotine salts describes a process for combining benzoic acids with nicotine, a formulation that mimics the nicotine salt additive developed by RJR. JUUL's use of benzoic acid and manipulation of pH affect the palatability of nicotine inhalation by reducing the "throat hit" that users experience when vaping. Indeed, this was the objective behind using nicotine salts (as compared to "free base nicotine" which has a higher pH). According to Ari Atkins, one of the inventors of the JUUL device, "[i]n the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it . . . I've got to choose my words carefully here: Appropriate for inhalation."[137]

160.    Because smokers are already accustomed to a certain level of harshness and throat hit, developing a product with low levels of harshness and minimal "throat hit" is only a critical concern if your goal is to appeal to non-smokers, for example, youth. Minimizing the harshness of nicotine also allows one to vape more frequently and for longer periods of time and masks the amount of nicotine being delivered by eliminating the unpleasant throat hit normally associated with large doses of nicotine. The harshness of free base nicotine makes prolonged vaping difficult; the use of nicotine salts solves that problem. Put another way, the nicotine salt technology behind JUULpods makes JUUL "smoke" highly potent yet hardly perceptible.

161.    The increased nicotine exposure facilitated by the JUUL device has serious health consequences. The ease of use and "smoothness" strip away external inhibitors and enable extreme levels of unfettered use. Using the JUUL's own calculations, consuming two JUULpods in a day is the equivalent of consuming two to four packs of cigarettes a day. In this way, JUUL

---

[137] David Pierce, *This Might Just Be the First Great E-Cig*, Wired.com (Apr. 21, 2015), https://www.wired.com/2015/04/pax-juul-ecig/.

has not only created a new generation of e-cigarette smokers but has also pioneered a new style of smoking—vaping—that is more nicotine-saturated than ever before.

162.    Increased rates and duration of smoking lead to greater overall exposure to nicotine. Nicotine is a neurotoxin. A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[138] Studies also show that exposure to nicotine as a teen—even minimal exposure—biologically primes the brain for addiction and greatly increases likelihood of dependence on nicotine as well as other substances later in life.[139]

163.    According to congressional testimony from Dr. Jonathan Winickoff, a professor of pediatrics at Harvard Medical School and the Director of Pediatric Research in the Tobacco Research and Treatment Center, "[n]icotine addiction can take hold in only a few days, especially in the developing adolescent brain that is particularly vulnerable to addiction to nicotine. . . Many of my patients find Juul nearly impossible to stop. Nicotine withdrawal can cause headaches, insomnia, irritability, anxiety, and depression, and these withdrawal symptoms

---

[138] N.A. Goriounova & H.D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function*, Cold Spring Harbor Persp. in Med. 2(12) (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[139] National Institute on Drug Abuse, *Principles of Adolescent Substance Use Disorder: A Research Based Guide* (2014), https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatment-researchbased-guide/introduction.

are one of the primary reasons a nicotine addiction is difficult to overcome."[140] Moreover, there is a lack of effective tools to help adolescents overcome nicotine addiction: there is no good data on how to treat adolescents with e-cigarette dependence; there has not been enough research on youth tobacco cessation strategies; and most of the pharmacological therapies approved for adults have been shown to be ineffective or only marginally effective in adolescents.[141]

164.    Research in Massachusetts indicates that daily use of JUUL and other e-cigarettes  is much more likely to continue than daily cigarette smoking. Out of the surveyed students who reported ever using cigarettes, only 17% indicated that they remained daily smokers. Out of the surveyed students who reported ever using e-cigarettes daily, 58% remained daily users. This data demonstrates both that e-cigarette use in teens is very persistent, a result consistent with the addictiveness of JUUL and the difficulty teens have in trying to quit.[142]

165.    E-cigarette use also puts adolescents at increased risk for cigarette smoking. Compared to adolescents who do not use e-cigarettes, those who do are 3.5 times more likely to begin smoking cigarettes.

166.    The dangerous and destructive nature of nicotine is no recent discovery. As a key ingredient in tobacco products, the drug and its deleterious effects have been the subject of scientific research and public health warnings for decades. Nicotine causes cardiovascular,

---

[140] Jonathan Winickoff, *Testimony of Jonathan Winickoff before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy* ("Winickoff Testimony") at 2, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

[141] *Id.*

[142] *Id.*

reproductive, and immunosuppressive problems with devastating effects. Part of the reason the national decline in cigarette use in recent years was such a victory for public health was because there was a corresponding decline in teen exposure to nicotine. From 2000 to 2017, the smoking rate among high school students fell by 73%.[143]

167.    That trend has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[144] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[145] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[146] This drastic reversal caused the CDC to describe youth vaping an "epidemic."[147]

---

[143] Matthew L. Myers, *Press Release: On 20th Anniversary of State Tobacco Settlement (the MSA), It's Time for Bold Action to Finish the Fight Against Tobacco*, Campaign for Tobacco-Free Kids (Nov. 26, 2018), https://www.tobaccofreekids.org/press-releases/2018_11_26_msa20.

[144] *Progress Erased: Youth Tobacco Use Increased During 2017-2018*, Ctrs. for Disease Control and Prevention, (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

[145] *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason*, Ctrs. for Disease Control & Prevention (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

[146] Scott Gottlieb, *Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes*, U.S. Food & Drug Admin. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scottgottlieb-md-proposed-new-steps-protect-youth-preventing-access.

[147] Adams, *supra*

57

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    168.    The 2018 Indiana Youth Tobacco Survey revealed that more than one in three Indiana
16    High School students had used a JUUL product and 18.5% currently used e-cigarettes.

17    169.    The Surgeon General has warned tthat this new epidemic of youth ecigarette use could
18    condemn a generation to a "lifetime of nicotine addiction and associated health risks."

19    170.    The swift rise in a new generation of nicotine addicts has overwhelmed parents,
20    schools and the medical community, including city and county public health departments, on the
21    front lines dealing with this crisis, drawing governmental intervention at nearly every level –
22    however, it's too little, too late.

23    171.    The teen vaping epidemic of which JUUL is the architect has and will continue to have
24    significant costs, both for individual users and for society. Nicotine addiction alone has
25    significant health care costs, and these costs are exacerbated when adolescents are involved.
26
27
28

172.    Adolescent nicotine addiction leads to memory and attention problems, and increases chances of addiction later in life, all of which will continue to have long-lasting impacts on society.

173.    Science is also beginning to show that e-cigarettes have the potential to cause even more, distinct health risks and costs. The very same liquids that enable e-cigarettes to deliver nicotine with such potency are proving to be increasingly dangerous. When heated, the vape liquid turns into aerosol, which may contain, in addition to nicotine, ultrafine toxic particles such as lead, additional chemicals, and volatile organic compounds.[148] These chemicals have the potential to be deadly. Vaping is now linked to conditions like chronic obstructive pulmonary disease and seizures, and there were 193 possible cases of severe lung illness associated with e-cigarette product use in 22 states in less than two months in the summer of 2019 alone.[149] Public health officials reported the first known death from a vaping-related illness on August 23, 2019.[150] By early October 2019, lung illness tied to vaping had killed 19 people, and there are now over 1,000 possible cases of serious illness reported from 48 states, including in the State of Indiana.[151] 16% of these patients have been under the age of 18.[152]

---

[148] Lena H. Sun, *He went from hiking enthusiast to 'on death's door' within days. Doctors blamed vaping*, Wash. Post (Aug. 24, 2019), https://www.washingtonpost.com/health/one-mans-near-death-experience-with-vapingrelated-lung-failure/2019/08/24/ca8ce42c-c5b4-11e9-9986-1fb3e4397be4_story.html?arc404=true.

[149] *CDC, FDA, States Continue to Investigate Severe Pulmonary Disease Among People Who Use E-cigarettes*, Ctrs. for Disease Control & Prevention (Aug. 21, 2019), https://www.cdc.gov/media/releases/2019/s0821-cdc-fdastates-e-cigarettes.html.

[150] Matt Richtel & Sheila Kaplan, *First Death in a Spate of Vaping Sicknesses Reported by Health Officials*, N.Y. Times (Aug. 23, 2019), https://www.nytimes.com/2019/08/23/health/vaping-death-cdc.html.

[151] Denise Grady, *Vaping Illnesses Top 1,000, C.D.C.,* N.Y. Times (Oct. 3, 2019),
(footnote continued)

174.    Many teenagers are simply unaware of these risks, an ignorance that JUUL preys on. According to Dr. Winickoff, many of his patients believe JUULing is harmless:

> "Counseling teens and preteens on e-cigarette use is challenging. Many of my patients have wildly incorrect beliefs about e-cigarettes. They know that cigarettes are dangerous, but assume that Juul—since it's ubiquitous, comes in child-friendly flavors, and is marketed as a healthier alternative to smoking— must be harmless. I have to explain to kids that e-cigarettes do not have the same positive health benefits as the fruits whose flavor they copy. Even the term vapor calls to mind harmless water vapor. There is no water in these products." Winickoff testimony at 1.

### 9.    JUUL's "Remedial" Measures

175.    In the face of increasing public scrutiny and pressure, JUUL has taken action to curb underage use of its products, but its efforts have been ineffective at best and aggravating at worse. After media and researchers brought JUUL's advertising tactics front and center, it launched a new ad campaign focusing on former smokers and deleted social media accounts. But, JUUL designed its social media campaign to subsist off of user-made content, which remains unaffected by the absence of a JUUL-run account. In fact, as noted above, posts relating to JUUL increased after it stopped its direct social advertising campaign.

176.    JUUL's efforts to curb underage use through alterations to the product itself are similarly either ineffective or potentially damaging. JUUL's approach to its flavored products illustrates this point. In response to serious concerns about flavored products and youth vaping,

---

https://www.nytimes.com/2019/10/03/health/vaping-illnesses-cdc.html.

[152] *Id.*

JUUL did the following: (1) it slightly modified the flavor names (i.e., "Cool Mint" is now "Mint," "Crème Brulee" is now "Creme"); and (2) it limited the flavors carried by retail stores to tobacco and mint, while continuing to offer the full range of flavors (including popular ones such as Mango) online—a market which teens are particularly aware and adept at navigating. As Dr. Winickoff testified before Congress:

> "[it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's aesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented." Winickoff Testimony at 3.

177.    Similarly, restricting other flavors to online sales is of limited effectiveness. According to Dr. Winickoff, 80% of children get e-cigarettes from social sources, such as older friends, meaning that if the products are available for sale somewhere, children will get them.[153]

**10.  JUUL and Schools**

178.    In addition to severe health consequences, widespread "JUULing" has placed severe burdens on society and schools in particular. It is not an overstatement to say that JUUL has changed the educational experience of students across the nation. As one vape shop manager told

---

[153] *Id.*

KOMO News, "It's the new high school thing. Everyone's got the JUUL."[154]

179.  JUUL use has completely changed school bathrooms—now known as "the Juul room."[155] As one high school student explained, "it's just a cloud."[156] The ubiquity of JUUL use in high school bathrooms has generated numerous online spoofs about "the juul room." [157]



[154] *Juuling at School*, KOMO News (2019), https://komonews.com/news/healthworks/dangerous-teen-trendjuuling-at-school.

[155] Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that worries doctors, parents and schools*, Washington Post (Jul. 26, 2019), https://www.washingtonpost.com/local/education/helpless-to-thedraw-of-nicotine-doctors-parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-11e9-933d-7501070ee669_story.html.

[156] Greta Jochem, *Juuling in School: e-Cigarette Use Prevalent Among Local Youth*, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

[157] *Juul Hashtag Meme*, Stanford U. Res. into the Impact of Tobacco Advert. (2018), http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st681.php&token1=fm_pods_img37610.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=%23juul.

180.    Kids have also coined the term ***"nic sick"***—which, as one high school student explained to CBS News, "kinda seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."[158]

181.    Such rampant JUUL use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that JUUL use presents, both in and out of the classroom. A national survey of middle schools and high schools found that 43.3% of schools have had to implement not only an e-cigarette policy but a JUUL-specific policy.[159] Participants in the survey reported multiple barriers to enforcing these policies, including the discreet appearance of the product, difficulty pinpointing the vapor or scent, and the addictive nature of the product.[160]

182.    Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using JUULs on school grounds. According to the Truth Initiative, more than 40 percent of all teachers and administrators reported that their school uses camera surveillance near the school's restroom,

---

[158] *High school students say about 20% of their peers are vaping, some as young as 8th grade*, CBS News (Aug. 31, 2019), https://www.cbsnews.com/news/high-school-students-say-about-20-of-their-peers-are-vaping-some-asyoung-as-8th-grade/.

[159] Barbara A. Schillo, et al., *JUUL in School: Teacher and Administrator Awareness and Policies of E-Cigarettes and JUUL in U.S. Middle and High Schools*, Truth Initiative (Sep. 2019), https://journals.sagepub.com/doi/full/10.1177/1524839919868222?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%3dpubmed

[160] *Id.*

almost half (46 percent) reported camera surveillance elsewhere in the school, and 23 percent reported using assigned teachers for restroom surveillance.[161] Some schools have responded by removing bathroom doors or even shutting bathrooms down,[162] and schools have banned flash drives to avoid any confusion between flash drives and JUULs.[163]

183.    Schools have also paid thousands of dollars to install special monitors to detect vaping, which they say is a small price to pay compared to the plumbing repairs otherwise spent as a result of students flushing vaping paraphernalia down toilets.[164] Other school districts have sought state grant money to create new positions for tobacco prevention supervisors, who get phone alerts when vape smoke is detected in bathrooms.[165]

184.    Many schools have shifted their disciplinary policies in order to effectively address the JUUL epidemic. Rather than immediately suspending students for a first offense, school districts

---

[161] *How are schools responding to JUUL and the youth e-cigarette epidemic?*, Truth Initiative, (Jan. 18, 2019)

https://truthinitiative.org/research-resources/emerging-tobacco-products/how-are-schools-responding-juul-andyouth-e-cigarette

[162] Ana B. Ibarra, *The Juul's So Cool, Kids Smoke It In School*, Kaiser Health News (Mar. 26, 2018), https://khn.org/news/the-juuls-so-cool-kids-smoke-it-in-school/; Evie Blad, '*Juuling' Craze: Schools Scramble to Deal With Student Vaping*, Educ. Wk. (May 4, 2018),

https://www.edweek.org/ew/articles/2018/05/09/juuling-craze-schools-scramble-to-deal-with.html.

[163] Anna B. Ibarra, *Why 'juuling' has become a nightmare for school administrators*, Kaiser Health News (Mar. 2018),

https://www.nbcnews.com/health/kids-health/why-juuling-has-become-nightmare-school-administratorsn860106.

[164] Suzanne Monaghan, *Many schools installing vape detectors in bathrooms to discourage e-cigarette use*, KYW Newsradio (June 10, 2019), https://kywnewsradio.radio.com/articles/news/many-schools-installing-vapedetectors-bathrooms-address-rise-e-cigarette-use.

[165] Lauren Katims, *California Fights Vaping in Schools*, U.S. News & World Report (Apr. 30, 2019),

https://www.usnews.com/news/best-states/articles/2019-04-30/california-focuses-on-education-to-curb-vapingin-schools.

have created anti-vaping curricula which students are required to follow in sessions held outside of normal school hours, including on Saturdays.[166] Teachers prepare lessons and study materials for these sessions with information on the marketing and health dangers of vaping[167] —extra work which requires teachers to work atypical hours early in the mornings and on weekends.[168] Some schools will increase their drug testing budget to include random nicotine tests for students before they join extracurricular activities.[169] Under this drug testing protocol, first offenders will undergo drug and alcohol educational programming; second and third offenders will be forced to sit out from extracurriculars and attend substance abuse counselling.[170]

185.    JUUL actively sought to enter school campuses. The Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JUUL, including reviewing tens of thousands of internal documents, and concluded that JUUL "deliberately

---

[166] Lauren Katims, *California Fights Vaping in Schools*, U.S. News & World Report (Apr. 30, 2019),

https://www.usnews.com/news/best-states/articles/2019-04-30/california-focuses-on-education-to-curb-vapingin-schools.

[167] Pat Eaton-Robb, *Discipline or treatment? Schools rethinking vaping response*, Concord Monitor (May 26, 2019),

https://www.concordmonitor.com/Discipline-or-treatment-Schools-rethinking-vaping-response-25822972.

[168] Kathy Brown, *School trustees OK discipline for juuling/vaping offenses*, Gillette News Record (Aug. 29, 2019),

https://www.gillettenewsrecord.com/news/local/article_5ec28c96-fd48-5ae0-b267-4e417272d020.html.

[169] Christine Hauser, *This School District Has a Way to Combat Vaping: Random Nicotine Tests*, N.Y. Times (June 17, 2019),

https://www.nytimes.com/2019/06/17/us/nebraska-vaping-schools.html.

[170] *Id.*

targeted children in order to become the nation's largest seller of e-cigarettes."[171] The Subcommittee found that "(1) Juul deployed a sophisticated program to enter schools and convey it's messaging directly to teenage children; (2) Juul also targeted teenagers and children, as young as eight years-old, in summer camps and public out-of-school programs; and (3) Juul recruited thousands of online "influencers" to market to teens."[172]

186.    According to the Subcommittee, JUUL was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids. Such attempts included paying a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JUUL itself would provide the curriculum; offering schools $10,000 to talk to students on campus; and giving the Police Activities League in Richmond, California, $90,000 to provide JUUL's own vaping education program, "Moving On," to teenage students suspended for using cigarettes.[173] Meanwhile, JUUL would collect data about test scores, surveys, and activity logs about the students.

187.    Among the more egregious incidents reported by the Subcommittee was a July 24, 2019 presentation in which no parents or teachers were in the room for the presentation, the message conveyed was that the JUUL product was "totally safe," and the presenter even

---

[171] *Supplemental Memorandum for Hearing on 'Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I & II' from Committee Staff, to Democratic Members of the Subcommittee on Economic and Consumer Policy* (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[172] *Id.*

[173] Sheila Kaplan, *Juul Targeted Schools and Youth Camps, House Panel on Vaping Claims*, N.Y. Times (Jul. 25, 2019), https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.

demonstrated to the students how to use a JUUL.[174] The school was presumably paid for this meeting, which was marketed to the school as an anti-smoking initiative. A JUUL spokesman said JUUL is no longer funding such programs.[175]

**11. The Impact on Plaintiffs' School Districts**

188.    E-cigarettes recently surpassed conventional cigarettes as the most commonly used tobacco product among youth.[176]

189.    In Indiana, as of March 13, 2020, The Indiana State Department of Health reported that there have been 128 cases of "E-cigarette or Vaping Product Use Associated Lung Injury" (EVALI), and six deaths.[177]

190.    Among U.S. high school students in 2017, almost 28% reported having ever tried cigarette smoking; 8% reported currently smoking cigarettes (at least one time during the last 30 days); 42% reported having ever used an electronic vapor product (including e-cigarettes, e-cigars, e-pipes, vape pipes, vaping pens, e-hookahs, and hookah pens); and 13% reported

---

[174] *Supplemental Memorandum for Hearing on 'Examining JUUL's Role in the Youth Nicotine Epidemic: Parts I & II' from Committee Staff, to Democratic Members of the Subcommittee on Economic and Consumer Policy* (July 25, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[175] *Id.*

[176] Youth E-cigarette Use, CDC Vital Signs – February 2019 https://www.cdc.gov/vitalsigns/youth-tobacco-use/

[177] https://www.in.gov/health/erc/lung-injury-associated-with-e-cigarette-use-or-vaping/

currently using an electronic vapor product.[178] Despite current tobacco use, cigarette smoking has declined dramatically among Indiana high school students. The 2018 Indiana Youth Tobacco Survey revealed that more than one in three Indiana high school students had used a JUUL product and 18.5% currently used e-cigarettes,, with 24.2% reporting using JUUL.    The percentage of Indiana high school students using e-cigarettes has grown from 3.8% in 2012 to 18.5% in 2018 and from 1.2% to 5.5% or middle school students. [179]

191.    Alarmingly, e-cigarette use by high school seniors is higher than cigarette use was 10 years ago. Between 2016 to 2018, e-cigarette use in Indiana increased from 18.4% to 26.7% among high school seniors, a 45% increase; a 15% increase was seen among 8th grade students; and a 65% increase among 10th grade students. E-cigarettes put youth at risk for addiction and possibly worse asthma outcomes[180], yet almost 40% of 10th and 12th grade youth believe there is low or no risk of negative health effects.[181]

---

[178] Centers for Disease Control and Prevention. 2017. Youth Risk Behavior Survey Data. Retrieved from https://www.cdc.gov/healthyyouth/data/yrbs/results.htm.

[179] Highlights from the 2018 Indiana Youth Tobacco Survey, Tobacco Prevention and Cessation Commission (2018), available at

https://www.in.gov/isdh/tpc/files/Highlights%20from%20the%202018%20IYTS_FINAL.pdf.

[180] U.S. Food & Drug Administration. 2018. Youth E-cigarette Prevention Campaign Press Release. Retrieved from https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm

[181] Center for Prevention Research and Development





192.    Due to Defendants' misconduct the Plaintiffs' school districts have been forced to spend substantial sums of their budgets to fight the teen vaping epidemic that has affected one in four high school students.[182]

193.    Nicotine addiction's serious health consequences are exacerbated when school age adolescents are the nicotine addicts. Traditional educational curriculum and testing goals are based on the needs and performance of a health non-smoking teen. But nicotine addiction diminishes the ability of a school district to educate a teen nicotine addict due to memory and attention span problems and other electronic vaping associated lung illnesses.

194.    Sadly, the Defendants' desire to place profits over the safety and education of teens has forced the schools to alter curriculum development and class time, additional staff resources are necessary to address discipline and supervision issues.

195.    Defendants used the "Don't tell anyone" strategy to conceal the dangers of vaping and manipulate teens into believing vaping is a safe, non-offensive and a trendy, smart way to smoke. The distribution to minors went undetected for many educators because the Defendants disguised

---

[182]    Progress Erased: Youth Tobacco Use Increased During 2017-2018, CDC (Feb.11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html

the vaping systems to look like apple computer accessories resembling a thumb drive.

196.    Nicotine addicted teens do not have the benefit of being able to use nicotine substitutes since nicotine gum, lozenges and patches are based on adults. Nicotine substitutes are not labelled for use in teens. A teen nicotine addict is left with behaviour therapy alone, which predominately occurs during school hours with a school counsellor, albeit a counsellor the school district envisioned as academic support not psychological support.

197.    Due to Defendants' deceptive marketing campaigns, teens were unaware of the risks associated with vaping. In fact, most teens believed vaping was simply a harmless water vapor even when Defendants knew this is not a water vapor, when the E-Liquid is heated the chemicals combine and are delivered via an aerosol as a more potent compound in its heated state. Due to the delivery mechanism, vaping allows delivery of high-dose rapid nicotine hits that are highly addictive to teens.



198.    Vapor can be increased by increasing battery voltage, users typically do so in attempt to increase the nicotine hit.  The later-generation and "tank-style" devices with higher voltages (5.0 V) could produce formaldehyde at greater levels than cigarette smoke. Teen vaping addicts overcome the taste of formaldehyde to get the Nicotine hit that only an E-Cig aerosol delivery

can provide.

199.    Teens coined the term "nic sick" which one teen explained to CBS news, " kinda seems like a really bad flu, like, just out of nowhere. Your face goes pale, you start throwing up and stuff, and you just feel horrible."

200.    Vaping addiction is so prevalent among teens that high school bathrooms have generated numerous online memes about the new "juul room".[183]

201.    The ever-changing complexity of disguised vaping products coupled with the varying delivery systems, some of which are designed to be deliver more potent doses, has effectively added a higher acuity of care by the school nurses as well as additional responsibilities for teacher's job descriptions. Many now receive specialized training to respond to the various problems vaping can present on the school campus. Schools not only need an e-cigarette policy, but an "e-cigarette-specific" policy to address so teaching staff can identify the disguised vaping products, pinpoint the risks of the vapor or scent, the addictive effects of the vaping products and recognition of nicotine sickness, strokes and EVALI among students.

202.    The harmless myth began to unravel when the first known death occurred from a vaping-related illness on August 23, 2019. The CDC and FDA began to receive nation-wide complaints of other vaping-related illnesses prompting the CDC to coin the new term EVALI (E-Cigarette or Vaping Associated Lung Injury). By January 21, 2020, the CDC reported 2,711 hospital admissions to treat EVALI and 60 deaths were confirmed in 27 states.[184] Among the deceased were children as young as 15 years old.[185] These numbers continued to rise.

---

[183] Moriah Balingit, *In the 'Juul room': E-cigarettes spawns a form of teen addiction that worries doctors, parents and schools,* Wash. Post (July 26, 2019)

[184] https://www.cdc.gov/media/releases/2020/s0128-evali-cases.html

[185] https://www.beckershospitalreview.com/quality/cdc-confirms-youngest-vaping-death-in-us.html

203.    The airways of healthy "vapers" are abnormal.[186] School nurses are now tasked with identifying whether students with respiratory symptoms have the flu, EVALI, or nicotine sickness. EVALI is a rapidly declining respiratory condition that requires immediate oxygen and medical attention. School districts are traditionally not set up to provide such acute medical treatment. Heart monitoring and oxygen delivery requires additional training and certification for school nurses which is an added expense for school districts.

204.    Staff members have also had to spend increased time addressing student e-cigarette use. Due to the pervasive use of e-cigarette products in bathrooms described above, both administrators and staff now have to spend more time physically supervising students in the bathroom to ensure they are not using e-cigarette products.  Staff members are also spending significantly more time addressing discipline problems related to e-cigarette use.

205.    Counsellors and prevention specialists at Plaintiffs' school districts are also affected, having to spend time discussing e-cigarette use with students and trying to help students who have become addicted. Students are now beginning to tell counsellors that they are concerned about their peers using e-cigarettes and are afraid because the students do not know what they are putting in their bodies.

206.    E-cigarette use is an issue in both Indiana middle schools and Indiana high schools.

207.    In response to the effects of Big Tobacco's marketing to minors, Plaintiffs' school districts have also expended     resources on education efforts, including town halls and meetings to discuss e-cigarette use.

208.    Fully addressing the harms to Plaintiffs' school districts and school districts across State of Indiana that were caused by Defendants' conduct will require a comprehensive

---

[186] https://no-smoke.org/big-tobacco-and-juul/airways-of-healthy-vapers/

approach, one that includes addiction counsellors in schools, prevention education that includes information about the health consequences of e-cigarette use on adolescents' bodies and minds, developing refusal skills, and addiction treatment options. Without the resources to fund these measures, Plaintiffs' school districts and others similarly situated will continue to be harmed by the ongoing consequences of Defendants' conduct.

## IV.    CLASS ACTION ALLEGATIONS

### 1.    Class Definition

**209.        Pursuant to provisions of the Federal Rules of Civil Procedure ("Rule") 23(a),  (b)(2), and (b)(3), Plaintiff brings this action on its own behalf and on behalf of a proposed Indiana statewide class of other similarly situated school districts (collectively, "the Indiana Class"), defined as follows:**

> **Indiana Class:** All school districts in the State of Indiana that have spent resources addressing, or whose property has been affected by, student use of E-cigarette products.

210.    Plaintiffs seek to represent the following Indiana Class as well as any subclasses or issue classes Plaintiff may propose an/or the Court may designate at the time of class certification:

> **Indiana School Districts:** All school districts in the State of Indiana that have spent resources addressing, or whose property has been affected by, student use of JUUL products.

211.    Excluded from the Classes are Defendants and their subsidiaries and affiliates; all

school districts who make a timely election to be excluded from the Classes; and the Judge to whom this case is assigned and his or her immediate family. Plaintiff reserves the right to revise the definitions of the Classes based upon information learned through discovery.

212.   Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims regarding liability and entitlement to injunctive relief, abatement, and damages on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

213.   This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule 23.

242.   Plaintiff reserves the right to modify the definition of the Classes or add Sub-Classes prior to class certification.

214.   Federal Rule 23 provides that an action may be maintained and the party may sue or be sued as a representative party of the class only if the court finds:

A.  The class is so numerous that joinder of all members is impracticable.

B.  There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

C.  The representative parties will fairly and adequately protect the interest of the class.

D.  The class action is an appropriate method for the fair and efficient adjudication of the controversy.

215.   **Numerosity:** The members of the Class are so numerous and geographically dispersed that individual joinder of all members of the Class is impracticable. There are 147 School Districts in Indiana serving 1,112,611 students.  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media, and/or published notice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

216.  **Commonality and Predominance:** This action involves significant common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, but not limited to:

A. Whether Defendants engaged in the conduct alleged herein;

B. Whether Defendants created a public nuisance;

C. Whether Defendants unlawfully contributed to a public nuisance;

D. Whether the rise in youth vaping and nicotine addiction was substantially caused by Defendants' conduct;

E. Whether Defendants' conduct injures or endangers the health and safety of students, teachers, and their communities nationwide;

F. Whether Defendants' conduct injures or endangers the health and safety of Indiana students, teachers, and their communities;

G. Whether Defendants unlawfully marketed and/or sold E-cigarette products to minors;

H. Whether Defendants continued to market and/or sell E-cigarette products to minors after it was on notice that E-cigarette products were being used in schools;

I. Whether Defendants engaged in a conspiracy;

J.  Whether Plaintiff and members of the Class are entitled to abatement; and

K. Whether Plaintiff and members of the Class are entitled to equitable and injunctive relief.

217.  **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Classes whom it seeks to represent under the Indiana Code of Civil Procedure, because Plaintiffs' school districts and members of the Class all had to expend resources addressing student E-cigarette

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

product use. Plaintiff and the other members of the Class suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other members of the Class. Plaintiffs' claims are based upon the same legal theories as the claims of the other members of the Class.

218.    **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes as required by the Indiana Code. Plaintiffs have retained counsel competent and experienced in complex class action litigation, including MDL litigation and other public nuisance litigation. Plaintiffs intend to prosecute this action vigorously. Neither Plaintiffs nor its counsel have interests that conflict with the interests of the other members of the Class. Therefore, the interests of the members of the Class will be fairly and adequately protected.

219.    **Declaratory and Injunctive Relief:**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

220.    **Superiority:**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct.

221.    Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## V.    CAUSES OF ACTION

**COUNT I: PUBLIC NUISANCE**

222.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

223.    The Defendants' conduct constitutes a public nuisance.

224.    Under Indiana law, a public nuisance exists where conduct that is injurious to health, indecent, offensive to the senses or obstructive to the free use of property such that it interferes with the comfortable enjoyment of life or property.

225.    The Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injure the property, health, safety or comfort of a considerable number of persons in Indiana by their untrue, false, and misleading promotion, marketing and unlawful sale of e-cigarettes for use by minor residents of Indiana.

226.    The Defendants' marketing conduct and subsequent sale of its e-cigarette use products is not only unlawful but has also resulted in substantial and unreasonable interference with the public health, and the public's enjoyment of its right that not to be defrauded or negligently injured.

227.    The Defendants' conduct is not insubstantial or fleeting. Indeed, the Defendants' unlawful conduct has so severely impacted the public health on every geographic and demographic level that the public nuisance perpetrated by the Defendants' conduct is commonly referred to as a "crisis" or an "epidemic." It has caused deaths, serious injuries, and a severe disruption of public peace, order and safety; it is ongoing, and it is producing permanent and long-lasting damage.

228.    By reason of the foregoing, Plaintiffs have been injured and continue to be injured in that it has paid and continues to pay for cost associated with the widespread use of school children's addiction to e-cigarettes. Plaintiffs have suffered additional damages and continue to suffer damage for the additional costs of providing education and additional resources to address e-cigarettes use in school aged children.

229.    Employees and patrons, including students, of Plaintiffs' school districts and the Indiana School Districts have a right to be free from conduct that endangers their health and safety. Yet Defendants have engaged in conduct which endangers or injures the health and safety of the employees and students of Plaintiffs' school districts and the Indiana School Districts by their production, promotion, distribution, and marketing of JUUL products for use by minors in Indiana and in a manner that substantially interferes with the functions and operations of Plaintiffs' school districts and the Indiana School Districts and impacts the public health, safety, and welfare of the entire State of Indiana communities.

230.    Defendants have created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff and its students and employees and the Indiana School Districts and interferes with the comfortable enjoyment of life and property of the entire communities of Plaintiffs' School Districts, and State of Indiana at large.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

231.  Defendants' conduct has directly caused a severe disruption of the public health, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

232.  This harm to the Plaintiff and the members of the Class outweighs any social utility of the Defendants' wrongful conduct because Defendants' conduct violates Indiana' public policy against marketing vapor products like JUUL to minors.

233.  Defendants' conduct violated this public policy, including by:

A.  Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

B.  Engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push JUUL products on JUUL's behalf, and by selling JUUL in flavors designed to appeal to youth;

C.  Engaging in advertising modelled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

D.  Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

E.  Hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media;

F.  Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products; and

G.  Promoting and assisting the growth of the JUUL market and its availability with knowledge that JUUL products were being purchased and used by large numbers of youth.

234.    The health and safety of the students and employees of Plaintiffs' school districts and the Indiana School Districts, including those who use, have used, or will use JUUL products, as well as those affected by others' use of JUUL products, are matters of substantial public interest and of legitimate concern to the Plaintiffs' students and employees, as well as to the entire Plaintiffs' school districts and the entire State of Indiana communities.

235.    Defendants' conduct has affected and continues to affect a substantial number of people within Plaintiffs' school districts and the Indiana School Districts and is likely to continue causing significant harm.

236.    But for Defendants' actions, JUUL/e-cigarette use by minors would not be as widespread as it is today, and the vaping public health epidemic that currently exists as a result of the Defendants' conduct would have been averted.

237.    Logic, common sense, justice, policy, and precedent indicate Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew or reasonably should have known that their statements regarding the risks and benefits of JUUL e-cigarettes were false and misleading, that their marketing methods were designed to appeal to minors, and that their false and misleading statements, marketing to minors, and active efforts to increase the accessibility of JUUL products and grow JUUL's market share were causing harm to minors and to school districts in the State Indiana. Thus, the public nuisance caused by Defendants was reasonably foreseeable, including the financial and economic losses incurred by Plaintiffs' school districts and the Indiana School Districts.

238.    Defendants' conduct has directly caused a severe disruption to public health, order and safety.   Defendants' conduct is ongoing and continues to produce permanent and long lasting damage.

239.    This harm to plaintiff and the public is substantial, unreasonable, widespread and ongoing.    It outweighs any potential offsetting benefit of the defendants' wrongful conduct because defendants' conduct violates Indiana's public policy against marketing e-cigarette products to minors.  This policy is expressed through statutes and regulations, including but not limited to:

    A.  Ind. Code Ann. § 7.1-7-6-5 and 7.1-7-5.5-1 which prohibit the sale of e-liquids to persons under the age of 21;

    B.  Ind. Code Ann. § 7.1-7-5.5-2, which prohibits the shipment of e-liquids without first making a good faith effort to verify the age of the purchaser;

    C.  Ind. Code Ann. § 7.1-7-5.5-3 which requires that payment methods for e-liquid delivery sales match the purchaser's name and that a retailer may only ship to the purchaser;

    D.  Ind. Code Ann. § 7.1-7-5.5-5, which requires delivery sales of an e-liquid be accompanied by a document stating: "E-Liquids:  Indiana law probibits the sale of this product to a person who is less than 21 years of age."; and

    E.  Ind. Code. Ann. § 24-5-0.5-3, which broadly prohibits an "unfair, abusive or deceptive act, omission or practice in connection with a consumer transation," which includes, among other things, "both implicit and explicit misrepresentations," regarding, among other things, that a product has "approval, ….characteristics…. uses, or benefits it does not have" or that a product "is of a particular standard."

240.    Alternatively, Defendants' conduct was a substantial factor in bringing about the public nuisance even if a similar result would have occurred without it. By directly marketing to

youth and continuing marketing practices after it was evidence that children were using JUUL products in large numbers and were specifically using these products in school, JUUL directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting Plaintiffs' school districts and members of the Indiana School Districts. By investing billions of dollars in JUUL and actively working to promote the sale and spread of JUUL products with knowledge of JUUL practice of marketing its products to youth and failure to control youth access to its products, Altria directly facilitated the spread of the youth vaping epidemic and the public nuisance affecting Plaintiffs' school districts and members of the Indiana School Districts.

241.    In addition, engaging in any business in defiance of a law regulating or prohibiting the same is a nuisance *per se* under Indiana law. Defendants' conduct described herein of deceptively marketing JUUL products to minors violates well established nuisance law and therefore constitutes a nuisance *per se*.

242.    Defendants' conduct is especially injurious to Plaintiffs' school districts because, as a direct and proximate cause of Defendants' conduct creating or assisting in the creation of a public nuisance, Plaintiff and its students and employees have sustained and will continue to sustain substantial injuries.

243.    Plaintiffs have had to take steps to mitigate the harm and disruption caused by Defendants' conduct, including the following:

A.  Assigning additional employees to monitor the school bathrooms to ensure students are not using e-cigarette products;

B.  Spending more time and resources addressing discipline problems at have arisen as a result of e-cigarette use;

C.  Confiscating e-cigarette products;

D.  Training teachers and staff regarding e-cigarette products and e-cigarette use;

E.  Training teachers and staff to recognize e-cigarette products;

F.  Training teachers and staff on the harms of e-cigarette use;

G.  Educating students as to the harm of e-cigarette use;

H.  Participating in town hall forums with parents to discuss e-cigarette use and the youth vaping epidemic;

I.  Updating its student handbook to address e-cigarette use; and

J.  Updating school policies to address use.

**COUNT II: CIVIL CONSPIRACY**

244.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

245.    Defendant JUUL and the Altria Defendants formed an association-in-fact conspiracy. This conspiracy is an ongoing and continuing business organization consisting of "persons" that created and maintained systematic links for a common purpose: to maintain and expand JUUL's massive, and ill-gotten, share of the e-cigarette market.

246.    As set forth above, Big Tobacco has long known the importance of targeting youth and addicting them to nicotine. This profits-above-public-health mentality applies with equal force to the e-cigarette market as well as the market for regular cigarettes. What was different here was that Big Tobacco was out competed by a start-up, albeit a start-up using some of Big Tobacco's tried and true tactics. As set forth in the complaint, JUUL obtained its massive market share over a short time period by successfully targeting youth and addicting youth to nicotine.

247.   JUUL was well aware that its conduct was reprehensible, and that if it became established and widely known that this was how JUUL obtained its massive market share, there would likely be severe consequences. For this reason, it went to great lengths to conceal this conduct by vociferously denying that it was marketing and targeting youth. Instead, JUUL argued that its product was created and designed as a "smoking cessation device"—despite the fact that the FDA never approved it as such, and that this smoking cessation device was slickly designed, easily concealable, and had its own "party mode." These false statements were designed to protect JUUL's market share by concealing its misconduct.

**1.   The Conspirators Sought to Fraudulently Increase Defendants' Profits and Revenues**

248.   Not everyone was fooled by JUUL's deception, particularly JUUL's competitors in the e-cigarette market. Altria recognized JUUL's tactics for what they were, designed to addict children, and made this clear in a public letter to the FDA on October 25, 2018. Altria even displayed this letter on its website, disclaiming the very marketing and advertising tactics JUUL relied on. At this time, Altria had apparently concluded that it could not out-compete JUUL—that JUUL's massive market share was too great to overcome. Altria informed the FDA that it was exiting the market for pod-based e-cigarettes, on the grounds that these products contributed to the youth vaping epidemic.

249.   Unfortunately, Altria's purported concern for public health was short-lived. A mere two months after publicly condemning JUUL's tactics for targeting youth, in December of 2018, Altria once again chose to place profits before the public health by making a $12.8 billion equity investment in JUUL, the largest equity investment in US history. Having long followed JUUL's market share dominance with envy, Altria decided to go from a competitor to a co-conspirator.

Altria and JUUL thus formed a conspiracy—the JUUL Conspiracy—with the goal of preserving, and profiting from, JUUL's ill-gotten market share.

250.    The JUUL Conspiracy recognized that one of the keys to preserving JUUL's market share was to continue to falsely deny that JUUL marketed its tobacco products to youth. Thus, in furtherance of their Conspiracy, JUUL and Altria repeatedly made statements denying that one of JUUL's intended targets for its product was children, that JUUL's product was really created and designed as a smoking cessation device, and that JUUL's product was all along intended for "switchers" (existing smokers that were open to vaping). These statements are false and deliberate actions.

251.    Thus, at all relevant times, each Defendant was aware of the conduct of the JUUL Conspiracy, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of sales and distribution of JUUL products.

252.    The persons engaged in the JUUL Conspiracy are systematically linked through contractual relationships, financial ties, and continuing coordination of activities. The Altria Defendants have invested $12.8 billion dollars in JUUL—the largest equity investment in United States history. This investment gives Altria a 35% stake in JUUL.

253.    Altria has already publicly acknowledged that under the terms of its financial relationship with JUUL, Altria will provide its considerable legal, regulatory and lobbying expertise to help JUUL navigate its relationship with regulators. Presumably this would also include former Commissioner Gottlieb's agency, the FDA. After receiving Altria's October letter criticizing JUUL's tactics, and learning of Altria's $12.8 billion investment, FDA Commissioner Gottlieb was outraged and demanded a meeting. Commissioner Gottlieb described this meeting as "difficult" and "did not come away with any evidence that public health concerns drove

Altria's decision to invest in JUUL, and instead sa[id] it looks like a business decision." Roughly one month later, he abruptly resigned his position.

254.    There is regular communication between JUUL and the Altria Defendants in which information regarding Defendants' scheme to protect, maintain and expand JUUL's market share is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Defendants share information regarding the operation of the JUUL Conspiracy and its cover-up of JUUL's efforts to target and addict youth.

255.    The JUUL Conspiracy functions as a continuing unit for the purposes of executing accomplishing its objectives, and when issues arise, each member of the Conspiracy agrees to take actions to support the Conspiracy.

256.    Each Defendant participated in the operation and management of the JUUL Conspiracy by directing its affairs as described herein. Altria's $12.8 billion investment gives it a 35% ownership stake in JUUL and allows it to appoint a third of its board. In a sign of Altria's management influence and control, JUUL's CEO resigned to be replaced by a career Altria executive, K.C. Crosthwaite. Mr. Crosthwaite previously served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work, including digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite is intimately familiar with Big Tobacco's practices, having previously served as the president and CEO of Philip     Morris USA, the vice president and general manager at Marlboro, and the vice president of strategy and business development at Altria Client Services LLC.

257.    While Defendants participate in, and are members of, the JUUL Conspiracy, they have an existence separate from the Conspiracy, including distinct legal statuses, affairs, offices and

roles, officers, directors, employees, and individual personhood.

258.    Without the willing participation of each Defendant, the JUUL Conspiracy's common course of conduct would not be successful.

### 2.    Deliberate actions

259.    The multiple acts of deliberate activity which the members of the JUUL Conspiracy committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued deliberate activity, and therefore constitute a "pattern of deliberate activity."

260.    The deliberate activity was made possible by the Conspiracy's regular use of the facilities, services, and employees of the Conspiracy.

261.    The members of the JUUL conspiracy participated in the Conspiracy by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

262.    The members of the JUUL conspiracy used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Conspiracy's objectives through common misrepresentations, concealments, and material omissions.

263.    In devising and executing the objectives of the JUUL conspiracy, its members devised and knowingly carried out a material scheme and/or artifice to defraud the public by denying that JUUL's products were marketed to youth, and that JUUL was really created and designed as a smoking cessation device.

264.    For the purpose of furthering its desire to preserve and increase its market share, even at the expense exposing and addicting children to nicotine, the JUUL conspiracy committed these deliberate acts, which number in the thousands, intentionally and knowingly with the specific intent to advance its objectives including:

A. JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We

envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire. (JUUL Labs Website as of Oct. 7, 2019).

B.  "JUUL Labs exists to help adult smokers switch from combustible cigarettes." (JUUL Labs Website as of Oct. 7, 2019).

C.  "JUUL was designed with adult smokers in mind. . .. JUUL provides satisfaction to meet the standards of adult smokers looking to switch from smoking cigarettes" (JUUL Labs Website as of Oct. 7, 2019).

D.  "Our Intent [:] . . . [W]e believe that vaping can have a positive impact when used by adult smokers and can have a negative impact when used by non-smokers. Our goal is to maximize the positive and reduce the negative." (JUUL Labs Website as of Oct. 7, 2019).

E.  "It's a really, really important issue. We don't want kids using our products." (JUUL Chief Administrative Officer Ashely Gould, CNBC Interview, Dec. 14, 2017).

F.  "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." (JUUL Social Media Post, Mar. 14, 2018).

G.  "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. To paraphrase Commissioner Gottlieb, we want to be the off-ramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine. We won't be successful in our mission to serve adult smokers if we don't narrow the on-ramp. . .. Our intent was never to have youth use JUUL products. But intent is not enough, the numbers are what matter, and the numbers tell us underage use of e-cigarette products is a problem. We must solve it." (Statement of Former CEO of JUUL, Ken Burns posted on the JUUL website Nov. 13, 2018).

H.  "We are taking significant action to prepare for a future where adult smoker overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers. We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Statement of Howard Willard, Altria Chairman and Chief Executive Officer in an Altria Press Release, Dec. 20, 2018).

I.  "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (JUUL CEO Ken Burns, CNBC Interview, July 13, 2019).

J.  "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use Juul products. . .. That is a serious problem. Our company has no higher priority than combating        underage use." (Testimony of JUUL Founder James Monsees before the House Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy, July 25, 2019).

K.  "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." (JUUL statement in response to lawsuits, Aug. 13, 2019).

L.  James Monsees, one of the company's co-founders, said selling JUUL products to youth was "antithetical to the company's mission." (Quoted in New York Times article, Did JUUL Lure Teenagers and Get 'Customers for Life'? Aug. 27, 2018);

"Our focus is and will remain entirely on helping adult smokers switch away from combustible cigarettes, the leading cause of preventable death in the world." (Joshual Raffel quoted in *New York Times* article, Philip Morris and Altria Are in Talks to Merge, August 27, 2019).

"We have never marketed to youth and we never will." (JUUL statement quoted in *Los Angeles Times* article, Studies show how Juul exploited social media to get teens to start vaping, Sep. 24, 2019).

265.   The deliberate acts described herein were made in furtherance of Defendants' scheme and common course of conduct designed to cover-up JUUL's marketing to youth, thereby increasing or maintaining JUUL's market share, resulting in corresponding high profits for all Defendants.

266.   Many of the precise dates of the deliberate acts have been deliberately hidden and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of deliberate actions, including the specific types of fraudulent statements upon which, the JUUL conspiracy engaged in fraudulent activity in furtherance of its scheme.

267.   The members of the conspiracy have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this

Complaint, have participated as co-conspirators with Defendants and the members of the JUUL Conspiracy in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenue, maintain or increase market share, and/or minimize losses for the Defendants and their named and unnamed co-conspirators throughout the illegal scheme and common course of conduct.

268.    The members of the JUUL conspiracy aided and abetted others to unlawfully market and sell e-cigarettes to minors in violations of the above laws.

269.    To achieve their common goals, the members of the conspiracy hid from Plaintiff and the public: (1) the fraudulent nature of the JUUL conspiracy scheme; (2) the fraudulent nature of statements made by the JUUL Defendant regarding its efforts to target youth and the nature of its product; and (4) the true nature and objective of the relationship between the members of the conspiracy.

270.    Each member of the JUUL conspiracy, with knowledge and intent, agreed to the overall objectives of the schemes and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the members of the JUUL Conspiracy had to agree to conceal their fraudulent scheme.

271.    The members of the JUUL conspiracy knew, and intended that, the public would rely on the material misrepresentations and omissions made by them.

272.    As described herein, the members of the JUUL conspiracy engaged in a pattern of related and continuous deliberate actions for years. The deliberate actions constituted a variety of unlawful activities, each conducted with the common purpose of maintaining JUUL's ill-gotten market share and thereby continuing to receive significant monies and revenues from the public, including youth, based on their misconduct.

273.    The deliberate actions also had the same or similar results, participants, victims, and methods of commission.

274.    The deliberate actions were related and not isolated events.

275.    Defendants' fraudulent concealment was material to Plaintiff and the public. The pattern of deliberate activity described above is currently ongoing and open-ended and threatens to continue indefinitely unless this Court enjoins the deliberate activity.

### 3.    Plaintiffs Have Been Damaged by Defendants' Actions

276.    Plaintiffs have been injured by Defendants' deliberate actions. The repeated misstatements by the Defendants denying that JUUL marketed to youth and addicted children to nicotine serve to preserve JUUL's market share—a market share that is based upon children purchasing JUUL's tobacco products. The creation and maintenance of this youth e-cigarette market directly harms Plaintiffs by imposing costs on its business and property. These costs include: increased costs associated with curriculum development and class time, increased security staff time spent addressing discipline and supervision issues, and increased counselor time spent speaking to addicted students and peers who are concerned about this epidemic:

A.  As e-cigarette use has expanded, the school has had to develop new curriculum material and devote class time to discuss youth vaping with students in health class.

B.  Security staff has also had to spend increased time addressing student e-cigarette use. Due to the pervasive use of e-cigarette products in bathrooms described above, both administrators and security officers now have to spend more time physically supervising students in the bathroom to ensure they are not using e-cigarette products.

C.  Security and administrative staff are also spending significantly more time addressing discipline problems related to e-cigarette use.

D.  Counsellors and prevention specialists at Plaintiffs school districts are also affected, having to spend time discussing e-cigarette use with students and trying to help students who have become addicted. Students are now beginning to tell counsellors that they are concerned about their peers using e-cigarette and are afraid because the students do not know what they are putting in their bodies.

E. In response to the effects of the Defendants' marketing and sales to minors, Plaintiffs' school districts have also expended resources on education efforts. Indiana schools have held town hall forums to discuss the youth vaping epidemic.

**COUNT III: CONSUMER FRAUD AND DECEPTIVE CONSUMER SALES**

277.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

278.    Indiana Code, 24-5-0.5*, et seq.* "Indiana Deceptive Consumer Sales Act" serves to "protect consumers from suppliers who commit deceptive and unconscionable sales acts…and to encourage the development of fair consumer sales practices.  I.C. 24-5-0.5-1(b).

279.    The Manufacturer Defendants have engaged in unlawful and deceptive business practices in violation of Indiana Code as set forth above.

280.    The Manufacturer Defendants' practices as described herein are deceptive business practices that violate Indiana Code because the practices were and are intended to deceive consumers and occurred and continue to occur in the course of conduct involving trade and commerce throughout Indiana.

281.    At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties, and/or by aiding and abetting third parties,  violated Indiana Code by making and disseminating untrue, false, and misleading statements to Indiana school children to promote the sale and use of e-cigarettes, or by causing untrue, false, and misleading statements about e-cigarettes to be made or disseminated to Indiana school children and consumers in order to promote the sale and use of e-cigarettes to treat chronic e-cigarette addiction. These untrue, false, and misleading statements included, but were not limited to, statements that:

A. The risk of addiction from e-cigarette use is low;

B. E-cigarettes do not contain addictive chemicals;

C. E-cigarettes are not addictive;

D. E-cigarette use is a healthy alternative to tobacco use;

E. E-cigarette use doses can be increased without limit or greater risks;

F. Targeted children as demographic to use e-cigarettes, knowing the danger the e-cigarettes would pose to children;

G. Marketed the e-cigarettes to conceal their identity from school administration;

H. Long-term e-cigarette use improves functioning;

I. Alternative forms of e-cigarette addiction relief pose greater risks than e-cigarettes; and

J. New formulations of certain e-cigarettes successfully deter tobacco abuse.

282.    At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, also violated Indiana Code by making statements that omitted or concealed material facts to promote the sale and use of e-cigarettes to treat tobacco addiction.  The Manufacturer Defendants and their third-party allies repeatedly failed to disclose or minimized material facts about the risks of e-cigarettes, including the risk of addiction, and their risks compared to alternative treatments. Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about e-cigarettes untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of e-cigarettes for treatment of chronic e-cigarette addiction.

283.    At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties, and by aiding and abetting third parties, made and disseminated the foregoing untrue, false and misleading statements, and material omissions, through an array of marketing channels, including but not limited to: in person and other forms of detailing; speaker events, including meals, conferences, and teleconferences; CMEs; studies, and journal articles and supplements; advertisements; and brochures and other education materials.

284.    The Manufacturer Defendants knew at the time of making or disseminating these misstatements and material omissions or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, the Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of e-cigarettes.

285.    In sum, the Manufacturer Defendants: (a) directly engaged in untrue, false, and misleading marketing; (b) disseminated the untrue, false, and misleading marketing through third parties; and (c) aided and abetted the untrue, false, and misleading marketing by third parties.

286.    All of this conduct, separately and collectively, was intended to deceive Indiana consumers who used or paid for e-cigarettes for chronic e-cigarette addiction; As a direct result of the foregoing acts and practices, the Manufacturer Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of Idiana Code as described in this Complaint.

287.    By reason of the foregoing, the Plaintiffs were injured in that the Defendants' unbranded marketing of e-cigarettes for chronic e-cigarette addiction caused school aged children to use the highly addictive e-cigarettes during school hours and the concomitant

likelihood that a public nuisance would exist for school administrators throughout the State of Indiana to abate this nuisance.

**COUNT IV: DECEPTIVE TRADE PRACTICES VIOLATION, INDIANA CODE 24-5-0.5 *ET SEQ.* AND 35-43-5-3 *ET SEQ.***

288.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

289.    Indiana Code makes it unlawful for a person or business to represent that goods have a quality, use, benefit or characteristic they do not possess or engage in any conduct which may cause a likelihood of confusion or misunderstanding.

290.    At all times relevant to this Complaint, the Manufacturer Defendants, directly, through their control of third parties,, and/or by aiding and abetting third parties, violated the Deceptive Trade Practices Law by engaging in unfair acts or practices to promote the sale and use of e-cigarettes to treat chronic e-cigarette addiction. These acts or practices are unfair in that they offend public policy; are immoral, unethical, oppressive, or unscrupulous; and have resulted in substantial injury to Indiana consumers, including school aged children.

291.    The Manufacturer Defendants' unfair acts or practices include, but are not limited to:

A.  Targeting a vulnerable population—children—for promotion of e-cigarettes to treat chronic e-cigarette addiction in the face of the known, heightened risks of e-cigarette use to that population, including risks of addiction, adverse effects, hospitalization, and death.

B.  Deliberately using unbranded marketing to evade FDA oversight and rules prohibiting deceptive marketing.

292.    Finally, the Manufacturer Defendants' conduct has caused substantial, indeed grievous, injury to Indiana consumers, including school aged children. The staggering rates of e-cigarette use, abuse, and addiction, in Indiana alone, resulting from the Manufacturer Defendants' marketing efforts have caused substantial injury to the Plaintiffs, including, but not limited to, costs incurred, and continuing to be incurred by the People of Indiana and Indiana.

293.    The Manufacturer Defendants' success in extending the market for e-cigarettes to new patients and chronic conditions has also created an abundance of children addicted to their products, and fueled a new wave of addiction, abuse, and injury. The Manufacturer Defendants' scheme created both ends of a new secondary market for e-cigarettes— providing both the supply of e-cigarettes to sell and the demand of child victims to buy them.

294.    All of this has caused substantial injuries to children—in lives lost; addictions endured; unrealized economic productivity; broken lives, families, and homes.

295.    The profound injuries to Indiana school children, including the Plaintiffs which care for the children are substantial. No public policy justifies the Manufacturer Defendants' conduct in overstating the benefits, denying or downplaying the risks, and misrepresenting the superiority of e-cigarettes, which deprived Indiana school aged children and their families of the honest and complete information they need to make informed choices. Considering this campaign of misinformation (and especially given the addictive nature of these products), neither Indiana children nor the Plaintiffs could reasonably have avoided their injuries.

296.    The Plaintiffs were injured as a result of the Manufacturer Defendants' unfair and deceptive acts and practices targeted toward Indiana school children. At a minimum, the Plaintiffs seek to enjoin the Manufacturer Defendants from continuing their unfair and deceptive acts and practices.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT V: BREACH OF IMPLIED WARRANTIES**

297.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

298.    Defendants, in the manufacture, marketing, sale, and distribution of e-cigarettes impliedly warranted to Indiana school children that these e-cigarettes were appropriate for their and understood ordinary purposes as presented by Defendants; namely the e-cigarettes are safe and non-addictive without also warming of the risk of addiction and/or other long-term medical conditions as a direct and proximate result therefrom.

299.    Defendants and their agents, employees, servants, paid speakers, and/or other representatives knew or should have known that Defendants' e-cigarettes were addictive and caused a panoply of dangerous, long-term medical conditions.

300.    Indiana school children and their families reasonably relied upon the skill and judgment of Defendants and their agents, employees, servants, paid speakers, and/or other representatives as to whether these e-cigarettes were of merchantable quality, safe, for their intended uses as described by Defendants.

301.    Pursuant to the Indiana Code § 26-1-2-314 there exists an implied warranty of merchantability for Defendants' marketing and sale of their e-cigarettes.

302.    Defendants breached this implied warranty of merchantability by promoting, marketing, selling, and distributing their e-cigarettes as being fit for the "ordinary purpose" ascribed by Defendants when, in fact, their e-cigarettes are inappropriate, dangerous, and unfit for that purpose.

**COUNT VI: NEGLIGENCE**

303.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

304.    Defendants owed Plaintiffs a duty, including a pre-existing duty, to not expose Plaintiffs to an unreasonable risk of harm.

305.    Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in manufacturing, advertising, marketing, selling and/or distributing e-cigarettes.

306.    Defendants had a duty not to breach the standard of care established under numerous laws and regulations to report suspicious prescribing and to maintain systems to detect and report such activity.

307.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in marketing, distributing, and selling dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility vis-a-vis Indiana school children.  Their duty cannot be delegated.

308.    Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

309.    Defendants were negligent by marketing, distributing, and selling e-cigarettes in a way that created and fostered an illegal, secondary prescription e-cigarette use market that resulted in a foreseeable and unreasonable risk of harm to Indiana school children and Plaintiffs.

310.    The method by which Defendants created this market was by marketing, distributing, and selling e-cigarettes without regard to the likelihood that the e-cigarettes would be placed in the hands of children, and others not permitted to use or possess prescription e-cigarettes.

311.    A reasonably prudent e-cigarette use manufacturer and distributor should have anticipated an injury to Indiana school children and Plaintiffs as a probable result of marketing, distributing, and selling prescription e-cigarettes in this manner.

312.    It was reasonably foreseeable that Defendants' actions and omissions would result in the harm to Plaintiffs as described herein.

313.    Defendants had control over their conduct in Indiana schools. Defendants controlled their deceptive advertising and efforts to mislead the public, including their acts and omissions in detailing by their sales representatives, online communications, publications, and other means described in this Complaint.

314.    Because of the Defendants' deceptive Defendants' actions, e-cigarette use has become so widespread and resulted in an enormous public health hazard of e-cigarette use among the most vulnerable, school aged children.

315.    Reasonably prudent manufacturers of e-cigarettes would have anticipated that the scourge of e-cigarette use addiction would wreak havoc on communities, and the significant costs which would be imposed upon the schools within those communities.

316.    Defendants knew or should have known that their affirmative misconduct in engaging in an aggressive, widespread, and misleading campaign in marketing e-cigarettes to Indiana school children created an unreasonable risk of harm.

317.    As a direct and proximate result of Defendants' negligence and/or negligence *per se*, Plaintiffs have suffered and will continue to suffer economic damages.

318.    As a direct and proximate result of Defendants' negligence and/or negligence *per se*, Plaintiffs have suffered and will continue to suffer expenses necessary to address widespread public injury.

319.    Defendants' misconduct alleged in this case is ongoing and persistent.

320.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a party would reasonably expect to occur and is not part of the normal and expected costs of existence.  Plaintiffs allege wrongful acts which are neither discrete nor of the sort that can reasonably be expected.

321.     Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary services.

322.     Plaintiffs have suffered an indivisible injury as a result of the tortious conduct of Defendants.

323.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiffs.

324.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

**COUNT VII: COMMON LAW FRAUD**

325.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

326.    Defendants violated their duty not to actively deceive by intentionally and unlawfully making knowingly false statements, and by intentionally and unlawfully omitting and/or concealing information.

100

327.    By engaging in the acts and practices alleged herein, Defendants, in the relevant time period, with the intent that others rely on their omissions or suppression of information, omitted material facts that Defendants had a duty to disclose by virtue of these Defendants' other representations.

328.    In each of the circumstances described in inter alia the foregoing paragraph, Defendants knew that their failure to disclose rendered their prior representations untrue or misleading. Thus, Defendants had a duty not to deceive Indiana school children.

329.    In addition, and independently, Defendants had a duty not to deceive Indiana school children because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to the Plaintiffs and the public.

330.    These Defendants made these false representations and concealed facts with knowledge of the falsity of their representations. These Defendants' false representations and concealed facts were material to the conduct and actions at issue.

331.    Defendants intended and had reason to expect under the operative circumstances that the Plaintiffs, the public, and persons on whom Plaintiffs and its agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that Plaintiffs would act or fail to act in reasonable reliance thereon.

332.    Defendants' misstatements and omissions intentionally created the false narrative that their e-cigarettes were safe and were not addictive, which Defendants knew or should have known was false.  This directly led to the misuse and diversion of their e-cigarettes and the resulting e-cigarette crisis. Plaintiffs and Indiana school children were directly and proximately injured as a result of their reliance on Defendants misstatements and omission and Plaintiffs'

injuries were directly and proximately caused by this reliance because Plaintiffs had to pay for the increased costs, and the abatements costs of the addiction epidemic.

333.    By reason of its reliance on Defendants' misrepresentations and omissions of material fact, Plaintiffs suffered damages.

334.    Defendants' misconduct alleged in this case is ongoing and persistent.

335.    Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary services.

336.    These Defendants' conduct was accompanied by wanton and wilful disregard of persons who foreseeably might be harmed by their acts and omissions.

337.    Defendants' actions demonstrated both malice and aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.  The Defendants' fraudulent wrongdoing was done with a particularly gross and conscious disregard.

**COUNT VIII: UNJUST ENRICHMENT/RESTITUTION**

338.    Plaintiffs incorporate the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

339.    Defendants have knowingly and unjustly retained a benefit to Plaintiffs' detriment, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.  See Woodruff v. Ind. Family & Soc. Serv. Admin., 964 N.E.2d 784, (Ind. 2012), and in violation of Restatement of Restitution §115 (1937).

340.    By illegally and deceptively promoting e-cigarettes directly, through their control of third parties, and by acting in concert with third parties, Defendants have unjustly enriched

themselves at Plaintiffs' expense. Because of their deceptive promotion of e-cigarettes, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and Indiana lacks a remedy provided by law.

341.   In addition, and by reason of the foregoing, Indiana school children and Plaintiffs were injured and continues to be injured in that Defendants' ongoing concerted actions in illegally and deceptively marketing e-cigarettes.

342.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of e-cigarettes within Plaintiffs' Community, including from e-cigarettes foreseeably and deliberately marketed to Indiana school children.

343.   Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

344.    Plaintiffs have expended substantial amounts of money in an effort to remedy or mitigate the harms to its members and beneficiaries caused by Defendants' conduct.

345.   Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper marketing to Indiana school aged children.

346.   Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

347.   Plaintiffs have paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of e-cigarette use products.  Because of their conscious failure to exercise due

diligence, Defendants obtained enrichment they would not otherwise have obtained.    The enrichment was without justification and Plaintiffs lack a remedy provided by law.

348.    Defendants' misconduct alleged in this case is ongoing and persistent.

349.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort that Plaintiffs would reasonably expect to occur and is not part of the normal and expected costs of Plaintiffs' existence.    Plaintiffs alleges wrongful acts which are neither discrete nor of the sort that can reasonably be expected.

350.    Plaintiffs have incurred expenditures for special programs over and above Plaintiffs' ordinary services.

WHEREFORE, Plaintiffs prays for judgment certifying this class action pursuant to Rule 23 of the Federal Code of Civil Procedure on behalf of the proposed Indiana Class and Sub-Class of school districts, entering an Order that the conduct alleged herein constitutes a public nuisance under Indiana law; entering an Order that the Defendants are jointly and severally liable; entering an Order requiring the Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance; enjoining Defendants from engaging in further actions causing or contributing to the public nuisance as described herein; awarding equitable relief to fund prevention education and addiction treatment; awarding actual and compensatory damages; awarding statutory damages in the maximum amount permitted by law; awarding reasonable attorneys' fees and costs of suit; awarding pre-judgment and post-judgment interest; and such other and further relief as the Court deems just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff(s) hereby demand a trial by jury as to all claims in this action.

RESPECTFULLY SUBMITTED

Date: April 18, 2022                **MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN**

                                            By: /s/ Randi Kassan, Esq.
                                            Randi Kassan, Esq.
                                            Melissa Sims, Esq.
                                            Vicki Maniatis, Esq.
                                            100 Garden City Plaza, Suite 500
                                            Garden City, NY 11530
                                            Phone: 516-741-5600
                                            Fax: 516-741-0128
                                            rkassan@milberg.com
                                            msims@milberg.com
                                            vmaniatis@milberg.com
                                            *Attorneys for Plaintiffs*